STATE of Missouri, Respondent,

v.

Bobby Joe MAYES, Appellant.

No. SC 82743.

Supreme Court of Missouri,
En Banc.

Dec. 18, 2001.

Rehearing Denied Jan. 22, 2002.

616

618

Gary E. Brotherton, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shuan J. Mackelprang, Asst. Atty. Gen., Jefferson City, for Respondent.

LAURA DENVIR STITH, Judge.

Defendant Bobby Joe Mayes appeals his conviction by a jury of two counts of first-degree murder and two counts of armed criminal action in the double homicide of his wife, Sondra Mayes, and Sondra's daughter, Amanda Perkins, for which he received two death sentences and two sentences of life imprisonment, respectively.

Mr. Mayes alleges eighteen points of error. Because this case involves the imposition of the death penalty, this Court has exclusive appellate jurisdiction. *Mo. Const., art. V, sec. 3.* For the reasons set out below, the Court affirms the judgment of guilt, but remands for a new trial on the issue of punishment because the trial court committed prejudicial error in refusing, over Defendant's objection, to instruct the jury that it could not draw an adverse inference as to punishment from Defendant's failure to testify.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. *The Crimes*

■ Considering the facts in the light most favorable to the verdict, *State v. Thompson,* 985 S.W.2d 779, 782–83 (Mo. banc 1999), the jury could have found that at the time of the murder on August 10, 1998, Defendant was married to Sondra, and lived with her and his 14–year–old stepdaughter, Amanda, in Houston, Missouri. Defendant was scheduled to go to trial the next day, August 11, for committing statutory sodomy on his two minor daughters from a previous relationship. He wanted Sondra and Amanda to testify for him, and they had been endorsed as defense witnesses.

Evidence was presented that the couple was having financial and marital difficulties. Sondra had told Defendant that she would not testify for him unless he signed a document that purported to waive his right to contest Sondra's ability to unilaterally convey the couple's marital real property. On August 6, 1998, just four days before the murder, Defendant talked briefly with an acquaintance, Michael James, about his financial difficulties and indicated that he did not want to return home when his wife was there because they might get into a conflict. Defendant also unsuccessfully sought Mr. James' help to buy a gun, allegedly to rob another man.

The next day, August 7, 1998, Defendant signed the waiver of marital rights that Sondra had requested in return for her promise to testify. The State presented evidence that Sondra went to work at 8 a.m. on August 10, 1998, as usual. Sondra told her co-worker and friend, Cora Wade, that even though Defendant had signed the waiver "she had not been able to work up the courage to tell him that she still wasn't going to testify for him." Although Cora and Sondra planned to talk more in the afternoon, Sondra went home during her lunch break, as she did on most days, but never returned to work. A neighbor, Charles Noakes, saw both Sondra and Bobby Mayes' cars in the driveway at 12:15 p.m. At 1:15 p.m., he heard Bobby's car, which had a distinctive sound due to a defective muffler, start up and leave.

Cora called Sondra's house at about 1:15 p.m., when she realized Sondra had not yet returned to work, but no one answered. According to Mr. Noakes, about 45 minutes later Duane Sutton, Sondra's father, came by the house and knocked on the door. Mr. Sutton testified that he called through the window for Sondra, but no one answered.

Around 4:20 p.m., Mr. Noakes saw Defendant return home. Shortly thereafter Defendant called 911. When asked what was wrong, he said, "I don't know. I just come home and, I don't know. You just need to send somebody over here," and that someone was "hurt" and was not breathing. He refused to check for a pulse, stating, "I'm not going in there," but agreed not to touch anything and to flag down the ambulance.

Officer Campbell arrived to find Defendant pacing back and forth in the driveway and rubbing his hands with a blue shop cloth. When asked what was wrong, Defendant responded he did not know. The officer looked around the house and discovered Sondra's body in the master bedroom. When the next officer to arrive asked Defendant what was going on, he threw up his arms and shouted, "I have an alibi, I have an alibi. I've been fishing for the last three and a half hours." He was perspiring and "fidgety" and continued to wipe and scrub his hands with the blue shop cloth. When Chief of Police Kirkman arrived, Defendant said he had last seen his wife at 7:00 a.m., that he had been fishing at "Flat Rock" or "White Rock," and that he talked to her on the telephone briefly when he returned home to make a sandwich before returning to fish at either "Flat" or "Duke." Still massaging his hands, Defendant did not ask about his wife or even mention Amanda. Chief Kirkman observed ligature marks on the back of his hands.

After investigating Sondra's murder for some time, police learned that Amanda should have been home but had not been seen. Her partially clothed body was found on the floor next to her bed, with a blue comforter draped across the front of her body and with a very pronounced ligature mark on her neck. Chief Kirkman advised Defendant of his Miranda rights

and placed him under arrest. Police took him to the Texas County jail, where he consented to a search of his person and the seizure of his clothing. By early evening, Fred Martin, Defendant's attorney in his pending trial, met with him briefly. Later, a doctor found a laceration on Defendant's right hand and constriction injuries on the backs of both hands consistent with the ligature mark on Amanda's neck.

### B. The Trial

The State charged Defendant with two counts each of first-degree murder and armed criminal action. During the guilt phase, the State presented detailed evidence as to Defendant's conduct at the scene of the murder, as to what the police had seen in the house, and as to what that evidence showed about the manner of Sondra's and Amanda's deaths. The evidence indicated that Amanda had been subdued by a blow to the head and then draped over the edge of her bed and stabbed in the back approximately 21 times. Not every stab wound was life-threatening, but seven stab wounds penetrated her chest cavity, and at least one severed pulmonary arteries and veins. Experts testified that in the 15 minutes following the stabbings, Amanda lost about half of her total blood volume. She died of exsanguination and lack of oxygen due to the aspiration of some of her gastric contents into her lungs.

Amanda was partially undressed, and her panties were pulled down around her ankles. Medical witnesses testified that sperm, consistent with Defendant's DNA, was found on the blood-stained bed sheet. Some of the sperm appeared to be on top of the blood, thereby indicating that the sperm was deposited after the stabbings. The abnormal size of her rectum was consistent with either sodomy or with a spasm caused by strangulation. Amanda was also strangled with some type of cord,

leaving a very pronounced ligature mark around her neck.

Sondra had been stabbed with a knife on her breasts and her left ear. The knife was also thrust into her back, lodged between her ribs and pulled laterally between the bones. It entered her chest cavity and punctured her left lung and blood vessels. She also had defensive-type lacerations on her hands and left forearm. Like her daughter, Sondra died from exsanguination. Her body was found on her bedroom floor. Blood was splattered about the room on the bed, the floor, the table, and her body. A bloody t-shirt lying near her body contained blood stains, which contained genetic material matching Sondra and a genetic component that did not match Defendant, Sondra or Amanda.

Evidence at the scene indicated that the perpetrator cleaned up in the bathroom after the attacks. Police found a bloody fingerprint on the bathroom sink, later positively identified as matching Defendant's left ring finger. They discovered a pair of men's gray underwear with a bloodstain in a laundry basket and seized it and other items of evidence.

The State presented the testimony of Michael James, Charles Noakes and Cora Wade, described above. The State also presented, among other witnesses, the testimony of David Cook, who had shared a cell with Defendant for several days. Mr. Cook testified that Defendant admitted to him that he had killed Sondra and Amanda, explained how he had done so, and told him about the family's financial, marital and legal problems. On cross-examination, Defendant impeached Mr. Cook by showing that Mr. Cook had pending second-degree burglary and felony escape charges that were reduced after he agreed to testify.

Defendant presented expert testimony that no hairs foreign to the bodies of the two victims or Defendant were uncovered. Defendant also called Fred Martin, who was to represent him in his sexual assault trial. Mr. Martin testified that Sondra and Amanda were scheduled to be witnesses for the defense in that case and that, as far as he knew, as of the day of the murders they were still intending to testify on his behalf.

After more than a week of trial, the case was submitted. Because Defendant did not testify, at his request the court instructed the jury in accordance with Missouri Approved Instruction Criminal, Third Edition, (MAI–CR3d) 308.14 that: "Under the law, the defendant has the right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify." The jury deliberated for less than two hours before returning guilty verdicts on all four counts.

### C. Penalty Phase

The penalty phase of the trial was held before the same jury. The State submitted multiple statutory aggravators, including Defendant's prior history of sexual abuse, his prior convictions, depravity of mind, that each murder was part of a multiple homicide, and that the victims were killed due to their status as witnesses in a pending prosecution.

In support of the aggravators dealing with prior sexual abuse and prior convictions, the State presented evidence that Defendant had a history of sexual assault. In 1984, he attacked and tried to rape a 14–year–old roommate of one of his acquaintances. He also sexually assaulted and exposed himself to a 9–year–old girl while visiting with her mother. In all, the State presented evidence of prior convictions of first-degree sexual abuse, second-degree robbery, second-degree burglary, first-degree sexual abuse, indecent or im-

moral practices with another, and escape in the second degree.

Defendant presented mitigating evidence, including the testimony of Dr. Nelda Ferguson, a psychologist. Dr. Ferguson diagnosed Defendant as having behavioral and learning problems as well as a severe personality disorder and impulse control disorders. Dr. Ferguson offered her opinion, to a reasonable degree of psychological certainty, that due to these disorders Defendant was influenced by extreme mental or emotional disturbance at the time he killed his wife and stepdaughter. Dr. Ferguson also testified that, despite their severity, Defendant's disorders could be controlled with medication if he was in a structured environment such as prison.

Defendant chose not to testify in the penalty phase. Counsel therefore requested that the jury be instructed not to draw an adverse inference as to punishment from his failure to testify. In support, defense counsel specifically argued that since the instruction given in the guilt phase had only told the jury that it could not use his failure to testify against him in deciding his guilt, the jury might infer that it *could* use his failure to testify in the penalty phase against him unless instructed otherwise. The State objected that the instruction would be duplicative, and the trial court refused to give it. The State now concedes this was error. The jury recommended death on each count of first-degree murder and life imprisonment on each count of armed criminal action. The court sentenced Defendant in accordance with the jury's recommendation. Defendant appeals.

## II. GUILT PHASE ALLEGATIONS OF ERROR

### A. Juror Nondisclosure

■ Defendant claims that Alice Rouse, the jury foreperson, engaged in intentional misconduct by failing to respond affirmatively when the judge asked the venire panel "whether you or any of your loved ones or close relatives have ever been the victim of a crime." Defendant contends that this constituted intentional nondisclosure by Ms. Rouse, because in filling out her jury questionnaire she had checked the box marked "yes" next to the question, "Have you or any relatives been a victim of a crime?"

■ Admitting that he failed to preserve this issue for review because he did not raise the alleged discrepancy until the motion for new trial, Defendant asks for plain error review under Rule 30.20. Plain errors affecting substantial rights may be considered in the discretion of the court if it appears on the face of the record that the error alleged so substantially affected defendant's rights that a miscarriage of justice or manifest injustice would occur if the error were not corrected. Rule 30.20. "Whether manifest injustice occurred depends on the facts and circumstances of the particular case, and the Defendant bears the burden of establishing manifest injustice amounting to plain error." *State v. Campbell*, 26 S.W.3d 249, 256 (Mo.App. W.D.2000). Defendant argues that the juror's conduct deprived him of the right to challenge Ms. Rouse for cause or peremptorily and so caused him to be sentenced by "eleven jurors and an intermeddler."

■ A prospective juror must have an "open mind, free from bias and prejudice." *State v. Wheat*, 775 S.W.2d 155, 158 (Mo. banc 1989), *cert. denied*, 493 U.S. 1030, 110 S.Ct. 744, 107 L.Ed.2d 762 (1990). Prospective jurors have a duty to answer all questions fully, fairly, and truthfully during voir dire. *State v. Jackson*, 412 S.W.2d 428, 432 (Mo.1967); *State v. McKee*, 856 S.W.2d 685, 690 (Mo.App. S.D.

1993). The failure to respond to an applicable question can deprive counsel of information needed to exercise a peremptory challenge or challenge for cause. *State v. Martin,* 755 S.W.2d 337, 339 (Mo.App. E.D.1988); *State v. Endres,* 698 S.W.2d 591, 595 (Mo.App. E.D.1985).

In determining whether to grant a new trial, the court must determine whether a nondisclosure occurred at all, and, if so, whether it was intentional or unintentional. If unintentional, a new trial is not warranted unless prejudice resulted from the nondisclosure that may have influenced the jury's verdict. *Aliff v. Cody,* 987 S.W.2d 439, 444 (Mo.App. W.D.1999); *State v. Landers,* 969 S.W.2d 808, 811 (Mo. App. W.D.1998). On the other hand, bias and prejudice will normally be presumed if a juror intentionally withholds material information, *Portis v. Greenhaw* 38 S.W.3d 436, 443–44 (Mo.App. W.D.2001). Intentional nondisclosure occurs:

> 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable.

*Williams by Wilford v. Barnes Hosp.,* 736 S.W.2d 33, 36 (Mo. banc 1987). In addition, "[a] party who claims misconduct affecting a juror is required to call such fact to the court's attention as soon as he learns of it and has the opportunity to do so." *Salkil v. State,* 760 S.W.2d 142, 145 (Mo.App. S.D.1988). Whether the requirements for grant of a new trial are met in a particular case based on juror nondisclosure rests in the sound discretion of the trial court. *Portis,* 38 S.W.3d at 443.

Here, defense counsel had Ms. Rouse's questionnaire responses during voir dire, yet he failed to bring to either her or the court's attention the fact that she did not respond when asked whether close family members or loved ones had been the victim of a crime, although she had indicated in her questionnaire that a family member had been such a victim. Defense counsel says they did not notice the alleged discrepancy until the motion for new trial. Yet, the purpose of the questionnaire is to assist in examining the potential jurors during voir dire. It was a matter of trial strategy how counsel wished to use the questionnaire. That counsel chose not to cross-check Ms. Rouse's questionnaire with her oral responses until after trial should not provide the basis for granting a new trial. It would be unfair to do so where the discovery of the response in a timely manner was entirely within the control of counsel. "The burden is on defendant to probe into any area on *voir dire* which is considered to be grounds for disqualification." *State v. Walton,* 796 S.W.2d 374, 379 (Mo. banc 1990). This was the basis on which the trial court denied the motion for new trial, stating:

> Well, it's apparent that I know that the parties—the attorneys were furnished with those questionnaires and the information was on her questionnaire. If it wasn't part of trial strategy, they could have—they had the opportunity, of course, to question the witness if she forgot the point about being a victim if she didn't come forward to the Bench. She had informed us that she had been the victim of a crime. If you wanted to inquire further, you may—you could have done so, counselor.

The court acted within its discretion in so ruling. Moreover, even had the issue been timely raised, a defendant alleging juror misconduct during voir dire must present "evidence through testimony or affidavits of any juror, or other witness

either at trial or at the hearing on his motion for new trial." *Portis,* 38 S.W.3d at 445. Furthermore:

> defendant has the burden of proving his allegations on a motion for a new trial.... In order to prove intentional concealment by a juror, the defendant must, at a minimum, allege intentional concealment in his motion for new trial and file an affidavit from the juror setting forth the facts surrounding the alleged concealment which reveals prejudice to the defendant.

*State v. Potter,* 711 S.W.2d 539, 541 (Mo. App. E.D.1986).

Here, Defendant failed to offer either an affidavit or testimony of Ms. Rouse, or other evidence that she in fact did have a relative who had been the victim of a crime, or any evidence as to why she did not respond to the judge's inquiry. Defendant offered only the jury questionnaire. But, the question asked on the questionnaire—whether the jurors had any relative who was the victim of a crime—was broader than the one asked during voir dire— were any loved ones or close relatives the victim of a crime. So far as the record shows, Ms. Rouse's answers to both questions may have been true, for a juror may reasonably define "relative" differently than "loved one or close relative." *Cf. Banks v. Village Enterprises, Inc.,* 32 S.W.3d 780, 789 (Mo.App. W.D.2000) (commonly understood meaning of phrase "immediate family" does not include nephews, nieces or other collateral relatives). Or, she may have simply checked the wrong box on her questionnaire and not have a relative who was the victim of a crime. Because of counsel's failure to call the juror or otherwise establish the facts, this Court could only speculate as to whether any nondisclosure occurred at all, much less intentional nondisclosure. *Compare Martin,* 755 S.W.2d at 339–40 (juror dis-

closure found intentional where party presented evidence that she failed to disclose her son's father had been murdered); *Endres,* 698 S.W.2d at 595–96 (party proved intentional nondisclosure where party presented evidence that juror failed to disclose her half-brother was murdered). The trial court did not err in denying the motion for new trial on this point.

### B. Admission of Evidence of Attempt to Purchase Gun

■■■ Defendant alleges that the court erred in permitting the State to call as a witness Michael James, an acquaintance of Defendant who worked at a nearby surplus supply store. Mr. James was prepared to testify that Defendant asked him whether he knew where Defendant could purchase a gun, as Defendant wanted to rob someone.

Before Mr. James testified, Defendant filed a motion *in limine* to exclude his testimony entirely, alleging that the fact he asked Mr. James about buying a gun was irrelevant since the victims were not killed with a gun. He further argued that it would be unduly prejudicial to admit evidence that he said he wanted to use the gun to rob another, for this would constitute evidence of another crime. The State argued that Defendant's inquiry about a gun only four days before the murders tended to prove deliberation and thus was relevant to the crimes charged. The court ruled that the State could present evidence that Defendant tried to buy a gun shortly before the murders, but that the fact that he said that he wanted to use the gun in a robbery was irrelevant.

In accordance with these rulings, Mr. James testified that four days prior to the murders, Defendant entered the store, made "small talk" about what he had been doing and about needing money, and indicated that he did not want to get home

while his wife was there because it might "cause conflicts." Mr. James then testified that Defendant asked him where he could get a gun, but that he replied that he did not know where to get one, and the conversation ended.

■■■■ Defendant again argues on appeal that his inquiry about a gun was irrelevant, and should have been excluded entirely, since the murders were not committed with a gun, so there was nothing to connect them to his inquiry. Trial courts have broad discretion to admit or exclude evidence at trial. *State v. Johns,* 34 S.W.3d 93, 103 (Mo. banc 2000), *cert. denied,* 532 U.S. 1012, 121 S.Ct. 1745, 149 L.Ed.2d 668 (2001). Unless this discretion was clearly abused, error will not be found. *Id.* The trial court did not abuse its discretion in admitting testimony that Defendant inquired about purchasing a gun. Other Missouri cases have permitted introduction of evidence of a defendant's attempt to buy a weapon in order to show a plan to commit a crime or to show proof of deliberation.[1] "Intent is a state of mind, and it may be inferred from all the circumstances." *State v. Ray,* 945 S.W.2d 462, 468 (Mo.App. W.D.1997).[2]

■■■■ Defendant admits that, standing in isolation, *"perhaps* the gun would tend to prove deliberation," but argues that this could not be the case where, as here, he admittedly said he wanted the gun to rob someone, not to commit murder. He concludes that, by allowing Mr. James to testify that he tried to buy a gun, but excluding the evidence that he said he wanted to use it to rob another, the prosecutor engaged in misconduct and contorted the truth by impermissibly tying his question about getting a gun to the difficulties Defendant had with his wife, thereby implying that he wanted a gun to kill her.

But, the reason the prosecutor did not and could not ask about the reason Defendant said he wanted the gun was that defense counsel had moved to preclude such testimony. The court simply granted this motion. Defendant cannot now complain of error in a ruling he requested.[3] Defense counsel made no attempt to bring out the remainder of the conversation on cross-examination, nor did counsel ask the court to change this ruling.

### C. *Informant Testimony*

The State planned to call a prison informant named David Cook as part of its case-in-chief. Mr. Cook shared a cell with Defendant for a few days. Mr. Cook was to testify that Defendant had confessed that he killed his wife after arguing with her over "some kind of sex case." Defense counsel filed a motion *in limine* to exclude evidence of the sexual nature of the pending case, arguing that it was irrelevant to

---

**1.** *See, e.g., State v. Roe,* 845 S.W.2d 601, 607 (Mo.App. E.D.1992) (evidence defendant asked his girlfriend about using her gun was one fact supporting finding of deliberation); *State v. Holt,* 758 S.W.2d 182, 185–86 (Mo. App. E.D.1988) (fact defendant made statements to the effect that he wanted to get a knife for purposes other than committing murder could be offered as part of *res gestae* of the crime and to show his threatening behavior).

**2.** Defendant could have requested a limiting instruction on use of this evidence, *Thompson,* 985 S.W.2d at 788, but did not.

**3.** *State v. McFerron,* 890 S.W.2d 764, 767 (Mo.App. E.D.1995) ("defendant may not complain of prejudice which his own conduct created"), *citing, State v. Byrd,* 676 S.W.2d 494, 500 (Mo. banc 1984). *See also Hilton v. Crouch,* 627 S.W.2d 99, 102 (Mo.App. S.D. 1982) ("The general rule is that a party cannot complain on appeal of procedure which was adopted in the trial court at his own request....").

the murders and would unduly prejudice him. He further argued that Mr. Cook's testimony should be entirely excluded on various grounds. On three occasions before trial, defense counsel urged the court to rule on this motion. Immediately prior to voir dire, the court ruled that the State could elicit that Defendant told Mr. Cook that he faced an impending trial, but kept under advisement the question whether the State could mention the sexual nature of the charges.

After voir dire, but prior to opening statements, the court ruled that the State could elicit that Defendant's earlier trial involved sexual allegations or misconduct, but could not mention that the victims were his daughters. Defense counsel requested permission to re-open voir dire to ask whether the jurors could be fair and impartial upon hearing such evidence, but the court refused the request. Mr. Cook testified in accordance with this ruling. Defendant now asserts numerous errors in regard to his testimony.

■ 1. **Refusal to Re–Open Voir Dire.** First, Defendant argues that the judge erred in refusing to re-open voir dire once he ruled that Mr. Cook could mention the sexual nature of the pending charges. But, the court did not preclude defense counsel from questioning the venirepersons during the voir dire proper as to whether they could be open-minded upon hearing evidence about the sexual nature of the charges.[4] Defense counsel made a strategic choice to refrain from asking them about their reaction to allegations of sexual misconduct out of fear that the jurors would hold this information against his client and out of hope that the court would not admit this evidence. This was not unreasonable trial strategy. Counsel's real objection is with the timing of the

court's ruling the fact that it did not occur until after voir dire.

■ Defendant cites no authority for the proposition that the court was required to rule on his motion prior to voir dire. Even if the court had done so, its ruling would not have been binding, for a ruling *in limine* is interlocutory in nature; it is "a 'preliminary expression of the court's opinion as to the admissibility of evidence' and is subject to change during the course of the trial." *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 646 (Mo. banc 1997), *quoting, Brown v. Hamid*, 856 S.W.2d 51, 55 (Mo. banc 1993).

Of course, once the trial court ruled, counsel, using hindsight, wished he had asked additional questions on voir dire. But, that is true in any case in which a party has avoided a topic on voir dire in the hope of a favorable ruling during trial. To find error in failing to either rule before trial or re-open voir dire here, this Court would have to hold that in every case in which a judge holds a motion *in limine* under advisement or changes an *in limine* ruling, the judge must give counsel an opportunity to re-open voir dire. Unsurprisingly, counsel cites no authority for such a proposition, which would entirely change the nature of both voir dire and *in limine* practice. This invitation to make such a change in Missouri practice is rejected.

■ 2. **Evidence of Sexual Nature of Pending Charges.** Defendant argues that, apart from the timing of its ruling, the court erred in failing to preclude Mr. Cook and other witnesses from mentioning the sexual nature of the charges in the pending trial in which Amanda and Sondra were set to have testified. He argues the

---

**4.** *Compare State v. Clark*, 981 S.W.2d 143, 146–147 (Mo. banc 1998) (holding error in denying right to examine venire about critical facts).

sexual nature of the charges was irrelevant to whether he killed Sondra and Amanda and was introduced only to show his propensity to commit a crime and to unduly prejudice him.

While Defendant is correct that evidence of prior uncharged misconduct is inadmissible for the sole purpose of showing the propensity of a defendant to commit such acts, *State v. Smith*, 32 S.W.3d 532, 550 (Mo. banc 2000), it is admissible to show motive, intent, absence of mistake or accident, common scheme or plan, identity, or signature modus operandi. *State v. Roberts*, 948 S.W.2d 577, 591 (Mo. banc 1997), *cert. denied*, 522 U.S. 1056, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998). The offered evidence must be both logically relevant, "in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial," and also legally relevant, in that "its probative value outweighs its prejudicial effect." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). A trial court enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal. *State v. Hall*, 982 S.W.2d 675, 680 (Mo. banc 1998), *cert. denied*, 526 U.S. 1151, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999).

Here, the evidence of the sexual nature of the charges was not admitted to establish Defendant's propensity to commit sexual assaults, but to help establish the motive for his crimes. The support of a wife and stepchild in a case alleging sexual misconduct would be very important, and the lack of such support could be devastating. The anger that their decision not to testify might have engendered would explain the savage ferocity of his attacks, something that the jurors might not fully appreciate if they did not know the sexual nature of the pending case. Moreover, as discussed below, Mr. Cook testified that Defendant specifically mentioned the sexual nature of the pending charges when explaining why he killed his wife and stepdaughter, and the jury was free to believe Mr. Cook's testimony. The trial court carefully balanced the prejudicial nature of the proffered evidence with its probative value and excluded evidence that the two prior victims were Defendant's children. The admitted evidence was relevant to motive.

**3. Cross–Examination of Mr. Cook.** Mr. Cook testified that Defendant said he had an argument with his wife about "some kind of sex case" in which she refused to testify for him and then "he got really mad at her and he started smacking her around and he started stabbing her." Mr. Cook testified that Defendant said he "turned around and his stepdaughter or daughter was there and he—she was screaming and crying and he grabbed her and started strangling her and stabbed her too." He further testified that Defendant talked about a financial motive for the murder and said he had tried to make it look like a burglary and to develop an alibi that he was fishing.

Defendant claims the trial court abused its discretion by unduly limiting his cross-examination of Mr. Cook regarding Mr. Cook's motive to lie. In particular, he claims he was precluded from showing that Mr. Cook was an inherently unreliable prison "snitch." The trial court has broad discretion in determining the permissible scope of cross-examination. *State v. Oates*, 12 S.W.3d 307, 313 (Mo. banc 2000). The court did not abuse that discretion here. The court gave defense counsel broad latitude in cross-examining Mr. Cook about his motive to lie.

Counsel brought out on cross-examination that when placed in Defendant's cell,

Mr. Cook had pending felony burglary and escape charges, that Mr. Cook met with the police on the night of Defendant's arrest to secure arrangements for protective custody in another facility in exchange for repeating to police what Defendant told him, and that the State reduced the charges against him one month after he cooperated with them against Defendant. During cross-examination, Mr. Cook admitted that he was "hoping for some help" and "hoping for some benefit for this testimony." While the court did prohibit further cross-examination about the length of Mr. Cook's crime spree, about his girlfriend's pregnancy, and about the fact that a bar he burglarized belonged to his uncle, these issues were at best marginally relevant to his credibility and would have added little to the substantial attacks on Mr. Cook's credibility already made by defense counsel. The court did not err in limiting cross-examination.[5]

**4. Special Credibility Instruction.** Defendant also argues that the court should have given a special instruction, in addition to MAI–CR3d 302.01, informing the jury about the special lack of reliability of prison "snitches." He recognizes that this is inconsistent with normal Missouri practice, which provides for instructing the jury with a single instruction addressing the principles relevant to determining credibility, *see, e.g., State v. Silvey,* 894 S.W.2d 662, 671 (Mo. banc 1995), and which leaves the application of these principles to particular witnesses to argument of counsel. He further recognizes that Missouri's instruction is usually ade-

quate. But, he notes, a few jurisdictions, such as California, Oklahoma, and Montana, provide for special credibility instructions about informant testimony. He argues Missouri should follow their lead.

MAI–CR3d 302.01 properly advises the jury to consider all the circumstances surrounding the testimony of a witness, including any interest the witness may have in testifying. It also directs the jury to consider "any other matter that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness." These principles are the ones that govern all determinations of credibility in Missouri. Defense counsel brought out Mr. Cook's motive for lying on cross-examination and, during closing argument, told the jury that Mr. Cook "walked in this courtroom with a deal in his pocket and a lie on his lips." While defense counsel may feel that the approach taken by some other states is a better one, he has failed to show that Missouri's approach is inadequate or that the jury was not adequately instructed in this case. Moreover, he has failed to rebut the presumption that the jury followed and understood the instruction as given. *State v. Madison,* 997 S.W.2d 16, 21 (Mo. banc 1999).

### D. Sodomy of Victim.

Defendant contends the trial court erred by admitting evidence that he sodomized Amanda, thereby weaving suppositional evidence of "sexual innuendo" with Amanda throughout the trial. Evidence is relevant if it "tends to prove or disprove a fact in issue or corroborates

---

**5.** *See State v. Harris,* 870 S.W.2d 798, 809 (Mo. banc 1994) (in capital murder case, no abuse of discretion to disallow further inquiry about witness' possession of weaponry and failure to file tax returns; counsel sufficiently discredited witness about drug sales), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994); *State v. Hughes,* 908 S.W.2d 804, 807 (Mo.App. E.D.1995) (no abuse of discretion to disallow questions about drug buys on days previous to defendant's arrest, because counsel was allowed to attack the credibility of the officer by showing his lack of memory of other events on the same day as the arrest).

other relevant evidence." *State v. Rousan*, 961 S.W.2d 831, 848 (Mo. banc 1998), *cert. denied*, 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998), *quoting, Brown v. Hamid*, 856 S.W.2d 51, 56 (Mo. banc 1993). It is elementary that relevant evidence should not be admitted if it causes "prejudice wholly disproportionate to the value and usefulness of the offered evidence....". *Id.*

The evidence of sodomy supported the State's theory of a sexual motive for the crimes. It included evidence of finding Defendant's sperm on Amanda's bed sheet. Defendant concedes this evidence is "certainly suspicious," but argues there is no way to determine when the sperm got on the bed sheet. To the contrary, the State presented evidence that one stain on the sheet contained a mixture of genetic components consistent with both Amanda's and Defendant's DNA. He also presented evidence that some of the sperm was found on top of the blood on the sheet, indicating that it was deposited after Amanda was stabbed.

Dr. Douglas Anderson, a pathologist, offered his expert medical opinion that the condition of Amanda's body indicated acts of sodomy. Police discovered her lying face down on the floor, partially undressed. The presence of a large amount of blood on the mattress indicated that her body had been draped over the side of the bed. Moreover, her rectum was abnormally enlarged. Two aspects of the condition of her clothes also tended to indicate that she had been undressed while she was killed. First, there was evidence that she had been sloppily or hastily redressed. Second, she was stabbed 21 times, but her shirt had 32 cuts. This evidence indicated that her shirt had been pulled up and "bunched together" as the knife passed through the fabric.

The State presented this evidence to demonstrate that Defendant did not act impulsively but rather committed a planned sexual attack on Amanda and murdered her in order to keep her quiet. The trial court could have reasonably concluded that the evidence of sodomy was, taken as a whole, legally relevant because it provided the jury with a complete picture of the crime, and tended to show deliberation, motive, and animus on Defendant's part, and that it was not unduly prejudicial in light of its probative value. The jury was free to believe or disbelieve all, part, or none of the testimony of Dr. Anderson. *State v. Hineman*, 14 S.W.3d 924, 927 (Mo. banc 1999).

### E. Photographs

Defendant contends the court erred in admitting three graphic photographs. Generally, even gruesome photographs are admissible if they: (1) show the nature and location of wounds, (2) enable jurors to better understand the testimony at trial, and (3) aid in establishing an element of the State's case. *State v. Rhodes*, 988 S.W.2d 521, 524 (Mo. banc 1999). The court has broad discretion in deciding whether to admit or exclude photographs under this standard. *State v. Feltrop*, 803 S.W.2d 1, 10 (Mo. banc 1991), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). Its decision will not be overturned absent an abuse of discretion. *State v. McMillin*, 783 S.W.2d 82, 101 (Mo. banc 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Here, Defendant claims the pictures served only to infect the trial proceedings with "shock value" and to "inflame the passions and prejudices of the jury." Although the State agrees the photographs were graphic, it argues their probative value outweighed their prejudicial effect.

The State used all three photographs in conjunction with the testimony of Dr.

Anderson. The first photograph showed Amanda's enlarged rectum, which the expert indicated could have been caused by strangulation or sexual assault. Both causes were consistent with the State's theory of the case, namely, the manner in which Defendant attacked Amanda, and corroborated other evidence of sexual assault. Dr. Anderson testified that the second photograph showed the nature and location of a wound to Amanda's head and an area of bleeding that was consistent with blunt trauma to her head. This supported the State's theory that Defendant subdued Amanda by a blow to her head. The third photograph showed the effect of a stab wound that penetrated Amanda's lung and lacerated her pulmonary arteries. It was relevant to show the location and nature of Amanda's wounds and the cause of her death and was also used to support the State's argument that the orientation and depth of this stab wound was such that it required purposeful decision-making by the killer.

 Because the photographs showed the nature and extent of Amanda's wounds and aided in establishing the State's case and in helping the jury understand it, their admission was not error. "Insofar as the photographs tend to be shocking or gruesome it is because the crime is of that sort." *State v. Clemons*, 643 S.W.2d 803, 805 (Mo. banc 1983). *See also State v. Middleton*, 995 S.W.2d 443, 462 (Mo. banc 1999), *cert. denied*, 528 U.S.

1054, 120 S.Ct. 598, 145 L.Ed.2d 497 (1999). "To exclude graphic evidence solely because it is graphic would deprive the State of evidence when it needs it the most: the evidence would be inadmissible to prosecute what are typically the most serious crimes." *State v. Johnson*, 930 S.W.2d 456, 462–63 (Mo.App. W.D.1996). The court did not err in admitting these photographs.[6]

### F. Improper Closing Argument

 Defendant argues the court abused its discretion in failing to *sua sponte* declare a mistrial after the prosecutor told the jurors at three points in his closing argument in the guilt phase, without objection, that any verdict less than first-degree murder would be "an insult" to Sondra and Amanda. The trial court enjoys broad discretion in controlling the scope of closing argument, and its ruling will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice. *Johns*, 34 S.W.3d at 116. Courts especially hesitate to find plain error in the context of closing argument because the decision to object is often a matter of trial strategy, *Middleton*, 995 S.W.2d at 456, and "in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons*, 753 S.W.2d 901, 907–08 (Mo. banc 1988), *cert. denied*,

6. During oral argument in this Court, counsel for Mr. Mayes argued that the fact these photographs were displayed on a 60–inch television screen caused undue prejudice. While use of this screen was unnecessary, defense counsel did not object to it. To the contrary, when the court suggested showing all the exhibits on a screen in order to "speed up things," defense counsel replied, "Yeah, we can put it up." Mr. Mayes cannot now convict the trial court of error as to a procedure to which his counsel agreed. "[I]t is axiomat-

ic that a defendant may not take advantage of self-invited error or error of his own making." *State v. Wise*, 879 S.W.2d 494, 519 (Mo. banc 1994), *quoting, Richardson v. State*, 773 S.W.2d 858, 859 (Mo.App. W.D.1989). This Court has reviewed the sketch of the courtroom submitted by defense counsel after oral argument in this case, showing the location of the television screen. The Court grants the motion to supplement the record with this drawing but, for the reasons stated, does not find it determinative.

488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). To find an abuse of discretion, the prosecutor's statements must have had a decisive effect on the jury's determination. *State v. Armentrout*, 8 S.W.3d 99, 111–12 (Mo. banc 1999).

The defendant in *Smith* also complained that the prosecutor said, "anything less than murder in the first degree to those to [sic] people is an insult." 32 S.W.3d at 552. This Court found no error, reasoning that the comment appeared during an appropriate discussion of whether defendant's actions constituted first-degree murder and was isolated, brief, and not emphasized. *Id.* No less important was the fact that the comment "did not intimate to the jury that it would have to explain its actions to friends or family after the trial." *Id.* As in *Smith,* the comment here did not warrant a mistrial. Although the prosecutor repeated the comment, it appeared in the context of an appropriate summation of whether Defendant's actions constituted first-degree murder. Here, too, the comment did not suggest to the jurors that they would have to explain their verdict to family and friends.

### G. Character Evidence.

 Defendant argues that the trial court abused its discretion in admitting evidence that he argued with Sondra on several occasions prior to the murders and that his employer had "let him go." He now suggests that this constituted character evidence that tended to put him in a bad light. At trial, however, defense counsel objected only on the grounds of speculation and relevancy. A party may not raise a new claim of error on appeal. *State v. Driver,* 912 S.W.2d 52, 54 (Mo. banc 1995) ("To preserve an objection to evidence for review, the objection must be specific, and the point raised on appeal must be based upon the same theory.").

Accordingly, only plain error review will be accorded. Rule 30.20. Such review is to be used sparingly and does not justify review of every trial error that has not been properly preserved. *State v. Ringo,* 30 S.W.3d 811, 821 (Mo. banc 2000), *cert. denied,* 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001).

Here, the Court does not agree that the evidence constituted character evidence at all. The State used the evidence to prove motive, not that Defendant was a "violent" and "lazy man." This evidence was relevant to show that Defendant suffered from the pressure of financial and marital difficulties. The fact that Sondra and Defendant argued and that Defendant did not tell her about the loss of his job tended to demonstrate that he faced intense emotional stress and, so, was relevant to prove motive. Admission of the evidence did not constitute plain error.

### H. Invocation of Right to Counsel

 Defendant argues that his Sixth Amendment rights were violated because the police illegally conducted a medical examination of the lacerations on his hands after his arrest outside the presence of his attorney. His attorney at the time represented him in his pending trial for statutory sodomy. He admits he had not invoked his right to counsel as to the murders and that the Sixth Amendment right to counsel is offense specific and "cannot be invoked once for all future prosecutions...." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Therefore, invoking the right to counsel for one charge typically has no effect on a different charge for which a person has not yet been arraigned. *Hellum v. Warden,* 28 F.3d 903, 909 (8th Cir.1994), *citing, McNeil,* 501 U.S. at 175, 111 S.Ct. 2204. Nevertheless, he relies on a narrow exception to the "offense specif-

ic" aspect of the Sixth Amendment to argue that the murder charges were "inextricably intertwined" with the pending statutory sodomy charges against him and the police should not have been permitted to conduct a medical examination of him in the absence of his attorney. *See, e.g., U.S. v. Hines*, 963 F.2d 255, 257 (9th Cir.1992).

■■■ The Supreme Court has recently held that the standard for determining whether crimes are so "inextricably intertwined" that the Sixth Amendment right to counsel attaches to the new charges is whether the offenses would be considered the same under the test for determining double jeopardy outlined in *Blockburger v. U.S.*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Texas v. Cobb*, 532 U.S. 162, ——, 121 S.Ct. 1335, 1343, 149 L.Ed.2d 321, 331–32 (2001). Under that test, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180.

Defendant had invoked a right to counsel for the pending statutory sodomy charges. He did not invoke his right to counsel for the murder charges. The sodomy charge and the murder charge each require proof of an element that the other does not.[7] The Sixth Amendment, therefore, did not preclude police-initiated contact concerning the new murder charges. *See Cobb*, 532 U.S. at ——, 149 L.Ed.2d at 331–32.

***

7. Compare sec. 566.062, RSMo 1994, and sec. 566.064, RSMo 1994, defining statutory sodomy with sec. 565.020, RSMo 1994, defining first-degree murder.

8. Because, on appeal, the State does not raise any issue as to the wording of the offered

## III. PENALTY PHASE ALLEGATIONS OF ERROR

### A. Failure to Give Adverse Inference Instruction

■■■ Defendant did not testify during the guilt phase of the trial. Accordingly, at Defendant's request, when the issue of guilt was submitted, the jury was instructed in accordance with MAI Cr3d 308.14 that "No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify." Defendant was found guilty of all counts, and the penalty phase trial began. Defendant again chose not to testify and offered Instruction G. It informed the jury that it could not draw an adverse inference as to punishment from his failure to testify in the penalty phase. The State objected to the wording of the Instruction and Defendant modified it so that it was identical with the one given in the guilt phase except that it substituted the words "as to punishment" for the words "of guilt:"

> Under the law, the defendant has the right not to testify. No presumption as to punishment and no inference of any kind may be drawn from the fact that the defendant did not testify.

(emphasis added).[8] The State opposed both instructions, arguing that the giving of the guilt phase instruction was enough. Defendant persisted, however, arguing: "the instruction as it's given in the guilt phase does not include whether they can consider Mr. Mayes' continued right to silence in the punishment phase and that's

***

instructions, but argues only that it was not prejudicial to refuse to give an adverse inference instruction in the penalty phase, the Court does not address the propriety of the wording of either alternative instruction offered by Defendant.

the reason for adding this—requesting this be added." He further pointed out that Note on Use 4 to MAI–CR3d 313.30A specifically permits submission of a penalty phase instruction based on MAI CR3d 308.14 directing the jury not to draw an adverse inference from defendant's failure to testify.[9] The court refused both "no-adverse-inference" instructions.

The State now concedes this ruling was error under settled law of both this Court and of the United States Supreme Court. The privilege against self-incrimination under the Fifth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, states that no person "shall be compelled in any criminal case to be a witness against himself." *U.S. Const. amend. V.* Missouri's constitution has a similar provision. *Mo. Const. art. I, sec. 19.*

The privilege against self-incrimination assumes a special place in our criminal justice system, not least because it is the only constitutionally based privilege. *See Maness v. Meyers,* 419 U.S. 449, 461 n. 8, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). Its purpose was explained by the Supreme Court over 100 years ago:

> It is not every one who can safely venture on the witness stand though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offences charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not every one, however honest, who would, therefore, willingly be placed on the witness stand.

*Wilson v. United States,* 149 U.S. 60, 66, 13 S.Ct. 765, 37 L.Ed. 650 (1893).

*Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), applied these principles in a case in which the jury was told it was free to consider a defendant's silence in deciding guilt. The Court found that such a comment violated the Fifth Amendment, by "solemniz[ing] the silence of the accused into evidence against him," so that it unconstitutionally "cuts down on the privilege [against self-incrimination] by making its assertion costly." *Id.* at 614, 85 S.Ct. 1229.

*Carter v. Kentucky,* 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), even more explicitly recognized that the constitutional privilege gives a criminally accused person two complementary fundamental rights: the right to remain silent and the right not to have an adverse inference drawn from his or her exercise of the privilege. To protect these rights, the Court held not only that no comment could be made, but also that a no-adverse-inference instruction must be given if requested. *Id.* at 300, 101 S.Ct. 1112. It reasoned that, while courts could not prevent jurors from speculating about why a "defendant stands mute in the face of a criminal accusation," courts must use the "powerful tool" of jury instructions to reduce such speculation, *Id.* at 303, 101 S.Ct. 1112, for:

> "[j]ust as adverse comment on a defendant's silence 'cuts down on the privilege by making its assertion costly,' . . . . the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts

---

**9.** It states, "If any such instructions [from the first stage] are appropriate, they should be modified to properly reflect the law and circumstances as they exist in the second stage proceedings. *Among the instructions that might be applicable with necessary modifications are: 'Missouri Approved Instructions Criminal 3d 308.14 '"* (emphasis added).

an impermissible toll on the full and free exercise of the privilege."

*Id.* at 305, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241.

Missouri adopted and applied these principles to the failure to give a no-adverse-inference instruction in the penalty phase of a capital murder trial in *State v. Storey,* 986 S.W.2d 462 (Mo. banc 1999), *cert. denied,* 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 189 (1999), a case handed down over one year before the trial of this case. Mr. Storey had testified in the guilt phase but not in the penalty phase of his trial and requested a modified "no-adverse-inference" instruction for the penalty phase. *Id.* at 463. The trial court refused the instruction. *Id.* On appeal, the State conceded error in failing to give the requested instruction, but it argued that the failure was harmless and any prejudice caused by it was "purely speculative." *Id.* at 465. Applying the "harmless error" analysis of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), *Storey* found the error was not harmless and the prejudice caused by failing to give the instruction was not "purely speculative" because it could have affected the jury's decision to impose the death penalty. 986 S.W.2d at 465.

■ The State recognizes that the *Storey* analysis governs here, but argues that, in contrast to *Storey,* it has met its burden of showing that the failure to give this instruction was harmless beyond a reasonable doubt. *See State v. Bucklew,* 973 S.W.2d 83, 91 (Mo. banc 1998). In fact, the State goes so far as to contend that an error in failing to give an adverse inference instruction, although of constitutional dimensions, is *"virtually always harm-*

*less,"* and that "the absence of the no-adverse-inference instruction—even if requested—should almost never require reversal." In support, the State notes that Missouri allows a defendant to choose whether to request the no-adverse-inference instruction. Therefore, if it is up to a defendant to decide whether to request the instruction, then the instruction must be considered *"optional,"* and failure to give an optional instruction cannot, logically, be prejudicial.

The State's argument proves too much. Under the State's analysis, the instruction would have been "optional" in *Storey* also, and this Court would not have found the failure to give it prejudicial. Moreover, other instructions in Missouri are not required to be given if not requested by a defendant, such as an instruction on a lesser-included offense. Yet, the failure to give such an instruction when requested is reversible error if the instruction is supported by the evidence.[10] To argue that the failure to such an instruction is harmless on particular facts is appropriate; to suggest that it is optional denigrates this basic and fundamental constitutional right.

In fact, *Storey* concluded that the failure to instruct the jury was even more likely to be harmful than a prosecutor's direct comment on that silence, because in the absence of the instruction, " 'the inferences drawn by the jury [from silence] may be unfairly broad.' " *Storey,* 986 S.W.2d at 465, *quoting, Carter,* 450 U.S. at 301 n. 17, 101 S.Ct. 1112. While, in *Carter,* the United States Supreme Court was ultimately not required to resolve the issue of how to determine when this type of error requires reversal, it noted that "it is arguable that a

10. *See* sec. 556.046.2, RSMo 1994; *State v. Fowler,* 938 S.W.2d 894, 898 (Mo. banc 1997) ("the court errs in not giving a requested lesser included offense instruction if there is a basis for both an acquittal of the higher offense and a conviction of the lesser included offense").

refusal to give an instruction similar to the one that was requested here can never be harmless....". *Carter*, 450 U.S. at 304, 101 S.Ct. 1112.

■■■ The State also tries to distinguish *Storey* on the basis that, in *Storey*, the jury only found one aggravator but here the jury found multiple aggravators. The State suggests that, given the strength of its case, a no-adverse-inference instruction was not likely to have had a persuasive effect on the jury. But, while the strength of the State's case can be an important factor in determining whether an error is harmless, it cannot be the deciding factor in determining whether the failure to give a no-adverse-inference instruction was harmless in the penalty phase of a capital murder trial. In Missouri, the evaluation "of the aggravating and the mitigating evidence offered during the penalty phase is more complicated than a determination of which side proves the most statutory factors beyond a reasonable doubt." *Storey*, 986 S.W.2d at 464, *quoting, State v. Johnson*, 968 S.W.2d 686, 701 (Mo. banc 1998). Because Missouri is not a "balancing" state, "the jury has discretion to assess life imprisonment even if mitigating factors do not outweigh aggravating factors." *Storey*, 986 S.W.2d at 464. "[U]nder no circumstance must the jury impose a sentence of death." *Id.* Therefore, "the prejudice against a defendant who invokes the privilege—prejudice which is 'inescapably impressed on the jury's consciousness'—is not purely speculative as the State suggests." *Storey*, 986 S.W.2d at 464–65, *quoting, Carter*, 450 U.S. at 301 n. 18, 101 S.Ct. 1112, 67 L.Ed.2d 241.[11]

Another basis on which the State tries to distinguish *Storey* is that the *Storey* jury

never received any adverse inference instruction at all, whereas here, the jury was given an adverse inference instruction at the close of the guilt phase of the trial. But, due to the wording of the instruction given in the guilt phase of the trial, this discrepancy actually may have added to the prejudice of failing to give an adverse inference instruction at the end of the penalty phase. The guilt phase no-adverse-inference instruction stated:

> Under the law, the defendant has the right not to testify. *No presumption of guilt* may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify.

(emphasis added). This instruction told the jury only that no presumption arose *as to guilt* from Defendant's failure to testify. As Defendant specifically pointed out, it did not say that no presumption *as to punishment*, or no presumption at all, could be drawn from his failure to testify. The Court rejects the State's argument that the jury would know to apply this guilt phase instruction to the penalty phase anyway. As noted by *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1996):

> "The fact that juries have expectations as to what evidence ought to be presented by a party, and may well hold the absence of that evidence against the party, is also recognized in *the case law of the Fifth Amendment, which explicitly supposes that, despite the venerable history of the privilege against self-incrimination, jurors may not recall that someone accused of crime need not explain the evidence or avow innocence beyond making his plea* .... The assumption that jurors may have contrary

11. Moreover, *Lakeside v. Oregon*, 435 U.S. 333, 340, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), found "dubious" the assumption that

"the jurors have not noticed that the defendant did not testify and will not, therefore, draw adverse inferences on their own."

expectations and be moved to draw adverse inferences against the party who disappoints them undergirds the rule that a defendant can demand an instruction forbidding the jury from drawing such an inference."

519 U.S. at 189 n. 9, 117 S.Ct 644 (emphasis added).

The danger that the jury considered Defendant's failure to testify during the penalty phase was certainly present here. Indeed, the other penalty phase instructions may have specifically led the jury to believe that it *could not* consider the guilt phase no-adverse-inference-instruction in the penalty phase trial, for the first instruction given to the jurors in the penalty phase told them:

> *The law applicable to this stage of the trial is stated in these instructions and Instructions No. 1 and 2 which the Court read to you during the first stage of the trial.* All of these instructions will be given to you to take to your jury room for use during your deliberations on punishment.

(emphasis added). From the outset, then, the jury was advised that the penalty stage was different than the "first stage of the trial" and that only Instructions No. 1 and 2 from the guilt phase were applicable in the penalty phase.[12] The rest of the instructions for the penalty phase, the judge told the jury, were those he was then giving them.

While this instruction was an accurate statement of the law, the court's failure to then give the jury a no-adverse-inference instruction in the penalty phase opened the

door for the jury to consider Defendant's silence in the penalty phase. The jury was specifically instructed that the instructions it was then given were the only instructions it had an obligation to follow in fixing punishment. Accordingly, the jury had no reason to believe that the Fifth Amendment privilege against self-incrimination applied. The absence of a no-adverse-inference instruction was highlighted by the fact that the court did repeat several other guilt phase instructions in the penalty phase regarding issues such as whether the argument of counsel is evidence.

Finally, the State contends that the court repeatedly advised the jury that it could consider all the evidence in deciding punishment. Again, this is certainly correct, but this repeated admonition in the absence of an instruction that explicitly removed Defendant's silence from being treated as part of "all the evidence," and in addition to the court's admonition that only the instructions it was then giving them and Instructions 1 and 2 from the first phase of the trial were applicable, may well have permitted the jurors to conclude that they affirmatively could consider Defendant's silence in determining his punishment. Nothing prevented them from doing otherwise.[13] For these reasons, the State has failed to meet its burden of proving that the omission of a no-adverse-inference instruction in the penalty phase was harmless beyond a reasonable doubt.

### B. Stabbing an Inmate

■ Defendant alleges prosecutorial misconduct in the cross-examination of Dr.

---

**12.** Instruction No. 1 and No. 2 from the guilt phase did not advise the jury of the privilege against self-incrimination.

**13.** As Defendant notes, the State also arguably drew attention to his failure to testify by stating in closing argument in the penalty phase that, "[t]he *Defendant already had his*

*say* on August 10th, 1998, when he took both their lives. Now it's their turn to hear what is fair." While this was not an improper direct reference to his failure to testify, it could have added to the prejudicial effect of the failure to give the no-adverse-inference instruction in the penalty phase of the trial.

Nelda Ferguson, the only mitigation witness called by the defense. While it is unlikely that this precise issue will arise again on retrial, we address it briefly because Defendant has filed a motion asking us to remand for a new trial due to this alleged prosecutorial misconduct.

Dr. Ferguson testified that Defendant had an impulse control disorder, a personality disorder and an intermittent explosive disorder. She concluded he could control his impulses in a very structured environment and with medication. On cross-examination, she admitted that, despite the fact that he had been on medication and in a structured setting while incarcerated, he had accumulated 67 disciplinary and incident reports.

In order to test Dr. Ferguson's credibility, and to test the validity and weight of her opinion, the State further cross-examined her concerning an incident report that accused Defendant of stabbing another inmate. The State hoped to show that Dr. Ferguson was not familiar with his prior violence and that her testimony that his problems could be controlled in a structured environment "stood in stark contrast" to his numerous incident reports. In response, she said she considered everything, including the reported stabbing.

▇▇▇ On appeal, Defendant now offers a document that he claims shows he was cleared of the prior charge. He asserts that the prosecutor engaged in misconduct and misled the jury by asking Dr. Ferguson about her familiarity with this alleged incident without also clarifying for the jury that Defendant's name had been cleared.[14] But, Defendant did not raise this issue below, the document on which he relies is not in the record, and the State does not concede its accuracy. It is, therefore, not properly before the Court.

Even were the document in the record, and assuming it is accurate, defense counsel has offered no evidence that the prosecutor was aware of the document during trial. To the contrary, inasmuch as defense counsel failed to cross-examine on this issue, and instead agreed that the witness could be excused without further questioning, it appears that even defense counsel was not aware of it at the time. It is certain that counsel did not bring this matter to the trial court's attention until long after Dr. Ferguson had completed her testimony. The court cannot be faulted for not excluding testimony for a reason not made known to it.[15] Driver, 912 S.W.2d at 54.

### C. Other Penalty Phase Errors

Defendant argues he was not properly granted allocution, that the sentence fails a proportionality review under section 565.035, RSMo 2000, and that numerous errors were made in submission of statutory aggravators, in closing argument and in admission of hearsay evidence in the penalty phase trial. The Court declines to address these issues, which are not likely to arise on remand.

Defendant contends that the trial court abused its discretion in striking venireperson Morgan for cause based on her views

---

**14.** Defendant also argues that one cannot question a witness about specific acts of a defendant merely to show other crimes, and that is all that occurred here. But, the State may, as here, question a witness about specific acts to test that witness' credibility. *State v. Byrd*, 676 S.W.2d 494, 505 (Mo. banc 1984); *State v. Johnigan*, 494 S.W.2d 23, 25–26 (Mo.1973).

**15.** For these reasons, that portion of Defendant's motion to remand requesting a new trial due to prosecutorial misconduct in regard to this document is overruled. For the reasons set forth *infra* we either do not reach, or find no error in, the other issues raised in the motion to remand.

about the death penalty, and asks that for this reason we remand for a new penalty phase trial. The United States Supreme Court has stated that the test for determining disqualification of a juror on this issue is "whether the juror's views would 'prevent or substantially impair the juror in the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), *quoting, Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). This is the standard that our courts must apply. *State v. Christeson*, 50 S.W.3d 251, 264 (Mo. banc 2001).

On appeal, Defendant objects that the court erred in applying this standard to venireperson Morgan because, while she had equivocated at first about her ability to consider the death penalty, and while she was not willing to act as foreperson and sign the verdict form if the jury voted for death, she eventually indicated that she could realistically consider the death penalty. As any error in the application of the standard for juror qualification set out in *Wainwright* is unlikely to be repeated on remand for a new penalty phase trial, we need not determine whether the trial court erroneously applied the *Wainwright* standard to venireperson Morgan.

■ Defendant also argues that the trial court abused its discretion when it admitted evidence of prior convictions that do not fall within the terms of a statutory aggravator under section 565.032, RSMo 1994. *Johns* held that section 565.030.4, RSMo 1994, "permits the admission of all aggravating or mitigating evidence that is admissible under the rules of evidence, whether or not the evidence relates to a section 565.032 statutory aggravator." 34 S.W.3d at 112–13. Similarly, *Smith* held that nothing in section 565.032.2(1) prohib-

ited the introduction of such prior convictions. 32 S.W.3d at 557.

■ For the reasons set out in *Johns*, Defendant's contention that the jury, not the court, was required to determine whether his prior convictions for first-degree sexual abuse and second-degree robbery constituted "serious assaultive" convictions and so were statutory aggravators under section 565.032.2(1) is rejected. The determination of whether a prior offense is "serious assaultive" is a question of law for the court to decide. 34 S.W.3d at 114.

Finally, Defendant's argument that the "multiple homicide" statutory aggravator, section 565.032.2(2), RSMo 1994, is unconstitutionally vague is rejected. For the reasons set out in *Smith*, the aggravator's language is clear and constitutionally sound. 32 S.W.3d at 558. *Accord, State v. Barnett*, 980 S.W.2d 297, 309 (Mo. banc 1998), *cert. denied*, 525 U.S. 1161, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999).

## IV. CONCLUSION

For the reasons set out above, the judgment as to the death penalty on each conviction for first-degree murder is reversed, and the case is remanded for a retrial of the penalty phase. In all other respects, the judgment is affirmed.

**All Concur.**