Gary S. NADOLSKI and Patricia Elizabeth Nadolski, Respondents,

v.

Iftekhar AHMED, M.D., et al., Appellants.

No. WD 62527.

Missouri Court of Appeals, Western District.

June 15, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 27, 2004.

Application for Transfer Denied Sept. 28, 2004.

---

Norman I. Reichel, Jr., Overland Park, KS, for Appellants.

Joseph W. Elliott, Saint Joseph, MO, for Respondents.

Before JOSEPH M. ELLIS, C.J., THOMAS H. NEWTON and LISA WHITE HARDWICK, JJ.

THOMAS H. NEWTON, Judge.

Dr. Gary S. Nadolski suffered hemorrhages after undergoing surgery to remove a malignant tumor in his brain. The post-surgery bleeding caused permanent brain damage. Dr. Nadolski and his wife brought an action against defendants for medical malpractice and loss of consortium. The Nadolskis (plaintiffs) contend that defendants negligently failed to diagnose Dr. Nadolski's brain tumor in a timely manner. They contend that by the time the tumor was discovered, its size and vascularity greatly complicated the task of removing it and that defendants' delay in diagnosing the tumor caused the brain bleed and accompanying injuries.

After denying defense motions for a directed verdict, the trial court submitted the case to the jury. The jury rendered a defense verdict. The plaintiffs filed a motion for new trial based upon claims of juror misconduct and the injection of collateral source evidence into the case. The trial court granted the motion for new trial. Defendants[1] now appeal. They contend that the trial court erred in denying their motions for directed verdict because plaintiffs failed to make a submissible case on the question of causation. They further contend that the trial court erred in granting the new trial.

We conclude that the plaintiffs presented sufficient evidence on the question of causation to make a submissible case based upon expert testimony that Dr. Nadolski's bleed would not have occurred but for defendants' failure to diagnose the tumor in a timely manner. We further conclude that the trial court appropriately granted the new trial based upon the juror's failure to disclose information during voir dire. Accordingly, we do not address the question of collateral source evidence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dr. Nadolski experienced migraine headaches and vision problems during the late 1980s. After a severe episode in 1989, Dr. Nadolski went to the hospital for an MRI scan of his brain. At that time, the scan showed a marble-sized lesion on the brain. The doctors who saw Dr. Nadolski at that time—including Dr. Ahmed—diagnosed Dr. Nadolski with a complicated migraine leading to a stroke. A subsequent MRI scan administered in 1991 showed no significant change in the size of the lesion.

For the next eight years, Dr. Nadolski did not have any more MRI scans. Throughout the 1990s the symptoms persisted and worsened. When Dr. Nadolski saw Dr. Ahmed in April 1999, Dr. Ahmed recommended that Dr. Nadolski have another MRI scan. The scan showed that the lesion was approximately the size of a baseball. Based upon the results of this scan, Dr. Ahmed told Dr. Nadolski that he had a brain tumor. It was an anaplastic oligoastrocytoma—a very aggressive tumor—and it was growing rapidly.

In May 1999, neurosurgeon Dr. Robert Spetzler operated on Dr. Nadolski and

---

1. Defendants are referred to as: Iftekhar Ahmed, M.D., Dr. Iftekhar Ahmed, P.A. D/B/A Dr. Iftekhar Ahmed, P.C. Parveen Kumar, M.D. was also listed as a defendant in plaintiffs' first amended petition, but the record is not clear on the disposition of the action against Dr. Kumar.

successfully removed the tumor. After surgery, however, Dr. Nadolski suffered two bleeds in the brain. These bleeds left Dr. Nadolski with ongoing neurological and cognitive problems.

Defendants filed motions for directed verdict at the close of the Nadolskis' evidence and at the close of all the evidence. The trial court denied the motions and submitted the case to the jury. After the jury returned its verdict, the Nadolskis filed a motion for new trial, contending that defendants had improperly injected collateral source evidence into the case and contending that a juror had failed to disclose information requested of her during *voir dire* examination. Following an evidentiary hearing, the trial court granted the motion for new trial and said:

1. Defendant Dr. Iftekhar Ahmed and his counsel's injection of Plaintiffs' disability insurance into the trial during testimony and in closing argument was in flagrant disregard of this Court's order prohibiting same, was highly prejudicial and resulted in an unfair trial.

2. Juror [R] intentionally failed to disclose her and her husband's participation in prior litigation despite clear questioning on voir dire. It is clear that an ordinary lay person would reasonably have concluded that they should have disclosed that they or their family members had sued for a personal injury. The prior litigation was sufficiently significant and sufficiently related to the issues in Plaintiffs' case that the failure to disclose was prejudicial and resulted in an unfair trial.

Defendants raise three points on appeal. In their first point, defendants argue that the trial court should have granted their motions for directed verdict because the Nadolskis failed to make a submissible case on the question of causation. Defendants argue that, at most, the evidence only warranted submission of a claim for lost chance of recovery. In their second and third points, defendants contend that the trial court erred in granting the Nadolskis' motion for new trial on the collateral source and juror misconduct issues.

## II. Legal Analysis

### A. Plaintiffs Made a Submissible Case on the Question of Causation

In their first point, defendants argue that the trial court should have granted their motion for directed verdict in this case because plaintiffs have failed to show that Dr. Nadolski's brain bleeds would not have occurred but for Dr. Ahmed's negligence.

### 1. Standard of Review

The unique posture of this case requires us to consider the standard of review in some detail. Although defendants obtained a verdict in their favor, they now complain that the trial court erred in overruling their motions for directed verdict at the close of the plaintiffs' evidence and at the close of all the evidence. Defendants argue that plaintiffs did not make a submissible case on the question of causation because the only witness who testified that Dr. Nadolski's bleed would not have occurred but for defendants' negligence was plaintiffs' expert witness, Dr. Barry Levin. But defendants argue that we must disregard Dr. Levin's testimony because our standard of review only permits us to examine the "evidence and reasonable inferences therefrom in the light most favorable to the jury's verdict, disregarding evidence to the contrary." *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998); *see also, Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. banc 2003) ("To determine whether plaintiff made a submissible case, this Court

reviews the evidence in the light most favorable to the jury's verdict.").

██ It is true that this court ordinarily reviews the evidence in the light most favorable to the jury's verdict. *See, e.g., Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). In this case, however, the *prevailing defendants* are complaining about the trial court's directed verdict rulings. This is anomalous. A claim of reversible error presupposes prejudice to the party complaining about the error. *See, e.g., In re Estate of Pittman*, 16 S.W.3d 639, 642 (Mo.App. W.D. 2000) ("Only prejudicial error is reversible error."). What prejudice results from the trial court's directed verdict rulings when the defendants ultimately prevailed? The answer is none. Defendants have a reviewable point only if the trial court correctly granted plaintiffs' motion for new trial because in that situation defendants are no longer the prevailing parties. But at that point there is also no longer a jury verdict to which we must defer because the grant of a new trial has the effect of removing the judgment. *See State ex rel. Mather v. Carnes*, 551 S.W.2d 272, 279 (Mo.App.1977).

██ As discussed *infra*, in section II–B, we conclude that the trial court properly granted plaintiffs' motion for new trial. Thus, we review the evidence to determine whether or not the plaintiffs introduced substantial evidence that tends to prove the facts essential to recovery. *Schaffer v. Bess*, 822 S.W.2d 871, 876 (Mo.App. E.D. 1991). We review the evidence in the light most favorable to the plaintiffs, giving them the benefit of all reasonable inferences, and disregarding the defendants' evidence except as it aids the plaintiffs' case. *Id.; see also Uptergrove v. Hous. Auth. of Lawson*, 935 S.W.2d 649, 651 (Mo. App. W.D.1996) ("The reviewing court's determination is made by disregarding the

evidence submitted by the defendant and viewing the remaining evidence in the light most favorable to the plaintiff."). "If reasonable minds can draw different conclusions from the facts, causation questions are for the jury, and a directed verdict is not proper." *Schaffer*, 822 S.W.2d at 876.

## 2. Causation in Fact

██ "To make a submissible case in a medical malpractice action, the plaintiff must prove that the defendant failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession and that his negligent act or acts caused the plaintiff's injury." *Coon v. Dryden*, 46 S.W.3d 81, 90 (Mo.App. W.D. 2001).

██ Defendants argue that plaintiffs failed to make a submissible case here because they failed to establish causation in fact. To establish causation in fact, the plaintiff must show that his injury would not have occurred but for the defendant's negligence. *Id.* "Proof of causation in a medical malpractice case requires expert medical testimony when there is a sophisticated injury, requiring surgical intervention or other highly scientific technique for diagnosis." *Id.* (internal quotation marks and citations omitted). And when the plaintiff relies on such testimony in a case where there are two or more possible causes, the expert testimony must be given to a reasonable degree of certainty. *Id.* at 91. Expert testimony is insufficient when an expert "merely testifies that a given failure to act 'might' or 'could' have yielded a given result." *Id.* It is also insufficient "where the only evidence of a necessary element of a cause of action is self-contradictory." *Id.*

██ Viewed in the light most favorable to plaintiffs, the evidence presented by

them tends to prove that Dr. Nadolski's bleeds would not have occurred but for Dr. Ahmed's failure to diagnose the tumor earlier. Plaintiffs' expert neurologist, Dr. Barry Levin, so testified:

Q. Do you have an opinion, within a reasonable degree of medical certainty, whether the bleed would have occurred if the surgery would have been performed to remove the tumor before the aggressively, rapidly grade four tumor that was bigger than a baseball?

A. Yes.

Q. What is your opinion?

A. That this bleed would not have occurred.

Q. And do you have an opinion whether presently Gary Nadolski is disabled as a consequence of his significant—as a consequence of the bleed?

A. Yes.

Q. And what is your opinion?

A. Yes, that he is disabled on the basis of the hemorrhage that occurred.

* * *

Q. Do you have an opinion, within a reasonable degree of medical certainty, that it is the massive bleed that caused the impairments that Gary has presently, mentally and physically.

A. Yes.

Q. What is the opinion?

A. The impairments that you described indeed are due to the bleed.

* * *

Q. And you indicated that the bleed would not have occurred but for the failure to diagnose the tumor earlier?

A. Correct.

As this testimony demonstrates, Dr. Levin did not testify that the bleed "might" or "could" have occurred but for Dr. Ahmed's failure to diagnose the tumor earlier. Cf. Mueller v. Bauer, 54 S.W.3d 652, 655, 657 (Mo.App. E.D.2001) (plaintiff's only expert admitted that he could not say with reasonable probability what caused decedent's death and that it was a matter of speculation whether her death was caused by medication or a pre-existing condition); Super v. White, 18 S.W.3d 511, 517–18 (Mo.App. W.D.2000) (expert conceded that he could not testify to reasonable degree of medical certainty that defendant's negligence caused or accelerated patient's death).

Dr. Levin testified to a reasonable degree of medical certainty that the bleed would not have occurred but for Dr. Ahmed's failure to diagnose the tumor earlier. Cf. Portis v. Greenhaw, 38 S.W.3d 436, 442 (Mo.App. W.D.2001) (expert provided evidence to reasonable degree of medical certainty that decedent would not have required toxic high-dose chemotherapy if defendant had made a timely diagnosis of breast cancer and that failure to make such a timely diagnosis caused her death); Coon, 46 S.W.3d at 91–92 ("Dr. Newcomb did not testify that the doctors' breach of the standard of care 'might' or 'could' have caused Ms. Coon to suffer the pain and expense of the 1986 and the 1987 surgeries and the pain and discomfort from PID between the two surgeries but that the doctors' negligence 'did' cause such injuries regardless of the fact that Ms. Coon may also have suffered pain from the ovarian cyst or that the cyst may also have necessitated the 1987 surgery."); Schiles v. Schaefer, 710 S.W.2d 254, 259–61 (Mo.App. E.D.1986) (that decedent might have died even with proper administration of clot-busting drug did not render expert's testimony insufficient where expert testified unequivocally to a reasonable degree of medical certainty that failure to administer the drug caused the decedent's pulmonary embolism and death), overruled on other grounds as stated in Jensen v.

*ARA Servs., Inc.,* 736 S.W.2d 374, 377 (Mo. banc 1987).

The cases cited by Dr. Ahmed do not compel a different conclusion. The problem in *Tillman by Tillman v. Elrod* was that the plaintiff's expert could only say that a neonatologist's negligence "contributed but not significantly" to a child's cerebral palsy and could not identify any specific injury attributable to the neonatologist for the purpose of apportioning fault among the child's health care providers. 897 S.W.2d 116, 117–18 (Mo.App. S.D.1995). Unlike the expert in *Elrod,* Dr. Levin was able to testify to more than "speculation" or "conjecture" regarding defendants' role in causing the injury here.

Likewise, the problem in *Mast v. Surgical Services of Sedalia* was that the expert testimony was couched in such a manner as to make it uncertain which of two disjunctive possibilities caused the decedent's death. 107 S.W.3d 360, 373–74 (Mo.App. W.D.2003). That is not a problem here. Dr. Levin clearly testified that it was the failure to diagnose Dr. Nadolski's tumor that caused the bleed and his resulting injuries.

Dr. Levin's testimony was not inconsistent with the testimony of the operating neurosurgeon, Dr. Spetzler. Dr. Spetzler testified to a reasonable degree of medical certainty that the risk of a bleed in this case was much greater due to the large size of the tumor and, conversely, that the risk would have been much lower with a smaller, marble-sized tumor. He further testified:

> Q. What I'm asking for is certainly only that is within your knowledge based upon your recollection and based upon the medical record that we have here before you concerning your care treatment of a patient by the name Gary Nadolski. In prior conversations with you, you had indicated that it was your belief that Gary Nadolski's cognitive impairments at the time he left your facility were due to the massive bleed that he had sustained?
>
> A. That is correct.
>
> Q. And that the massive bleed that he had was associated directly with the size of this tumor that had a lot of blood vessels, correct?
>
> A. That's correct.
>
> Q. And that based on that, that certainly increased and gave us a high probability of there being a bleed?
>
> A. Yes.
>
> Q. Do you have an opinion as to whether or not this tumor based upon its size and number of blood vessels that it had that there was a high probability of it bleeding?
>
> A. A high or higher.
>
> Q. Higher?
>
> A. Higher than if it would not have had those features if small.
>
> Q. Yes. If it had been, for example, a low grade tumor that was small?
>
> A. That's correct.
>
> Q. Lastly, just following up again on our telephone conversation, that if you had—do you have an opinion as to whether if you would have had the opportunity to remove this tumor as a low-grade, smaller glioma, could it have been removed without the hemorrhagic—if I'm pronouncing that correctly. I think that's the word you used—hemorrhagic complications that a large tumor did, in fact, produce?
>
> A. There's always a risk with removing any size tumor, and it's the degree of risk that is significantly increased when the tumor is large and more vascular as compared to a small, nonenhancing tumor.

Q. And have all of your opinions that you've expressed here today been expressed within a reasonable degree of medical certainty?

A. Yes.

We conclude that the plaintiffs presented sufficient evidence to make a submissible case on the question of causation. Defendants' first point is denied.

### B. The Trial Court Appropriately Granted a New Trial As a Result of Juror Misconduct

■■■■ "A trial court has great discretion in determining whether to grant a new trial." *Duckett v. Troester,* 996 S.W.2d 641, 646 (Mo.App. W.D.1999). "Appellate courts should be more liberal in upholding a grant of a new trial than in awarding a new trial when the trial court denies the motion." *Bodimer v. Ryan's Family Steakhouses, Inc.,* 978 S.W.2d 4, 8 (Mo.App. E.D.1998). "An abuse of discretion occurs where the trial court's ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." *Duckett,* 996 S.W.2d at 646.

■■■■ The parties to this action have a constitutional right to a fair and impartial jury composed of twelve qualified jurors. *Williams ex rel. Wilford v. Barnes Hosp.,* 736 S.W.2d 33, 36 (Mo. banc 1987). Among other things, this means that the jurors who hear the case should be unbiased individuals "whose experiences, even innocently and reasonably undisclosed," will not prejudice the case. *Id.* During *voir dire* examination, each prospective juror therefore has a duty to "fully, fairly and truthfully answer each question asked so that determinations may be made about each juror's qualifications and counsel may make informed challenges." *Bell v. Sabates,* 90 S.W.3d 116, 120 (Mo.App. W.D. 2002) (internal quotation marks and cita-

tion omitted). When a juror fails to heed her duty by withholding material information and that failure results in bias and prejudice to the moving party, a new trial is warranted. *Id.*

■■■■ "In addressing a motion for new trial based upon juror nondisclosure, the trial court must first determine whether a nondisclosure occurred and, if so, whether the nondisclosure was intentional or unintentional." *Id.* The distinction between intentional and unintentional nondisclosure is significant. *Schultz v. Heartland Health Sys., Inc.,* 16 S.W.3d 625, 627 (Mo.App. W.D.2000). As the Missouri Supreme Court explained in *Williams,* this distinction largely determines whether prejudice can be inferred from a given non-disclosure:

> If a juror intentionally withholds material information requested on voir dire, bias and prejudice are inferred from such concealment.... For this reason, a finding of intentional concealment has "become tantamount to a per se rule mandating a new trial." ... Unintentional nondisclosure may or may not demand a new trial. It has been uniformly held that an unintentional failure to disclose information not connected with the case or bearing on the prospective juror's ability to fairly evaluate the evidence does not necessarily show prejudice on the part of the juror.... Thus, where nondisclosure is found to be both unintentional and reasonable, the relevant inquiry becomes whether, under the circumstances, the juror's presence on the jury did or may have influenced the verdict so as to prejudice the party seeking a new trial.... Prejudice is a determination of fact for the trial court, its finding to be disturbed on appeal only for abuse of discretion.

736 S.W.2d at 37.

### 1. Juror "R" Failed to Disclose Requested Information

■ Because a juror is not expected to answer a question that was never asked, a finding of juror non-disclosure necessarily presupposes that counsel asked the juror a question " 'reasonably calculated to elicit the allegedly withheld information.' " *Bell,* 90 S.W.3d at 120 (quoting *Banks v. Vill. Enters., Inc.,* 32 S.W.3d 780, 788 (Mo.App. W.D.2000)). If the juror reasonably responds to a question as it was posed, and that response reveals all known and relevant information, non-disclosure has not occurred. *Id.*

■ Thus, this court must first determine whether the question asked of Juror "R" was sufficiently clear to have elicited the undisclosed information from an ordinary juror. *Id.* " 'A question posed to the panel on *voir dire* is clear only if a lay person would reasonably conclude that the undisclosed information was solicited by the question.' " *Id.* (quoting *Ewing v. Singleton,* 83 S.W.3d 617, 620 (Mo.App. W.D. 2002)). " 'How a reasonable lay person interprets the meaning of a question depends not only on the words used, but also on the context.' " *Id.* (quoting *Keltner v. K–Mart Corp.,* 42 S.W.3d 716, 726 (Mo. App. E.D.2001)). Whether a question is clear is a threshold issue that this court reviews *de novo. Id.*

■ During *voir dire,* counsel for Mr. Nadolski said:

I want to ask you a couple of quick questions, about *any cases* that any of you or immediate member of your family have brought as plaintiffs. This gets into that area—think really hard on this. Try not to forget anything. Sometimes at the end of a case somebody is unhappy with the result, and they go and check and see what cases people have been involved in the past, and then they ask for a new trial. I'm going to read to you what I don't need to know about.

I don't need to know about divorce matters, custody matters, criminal matters, contract matters, collection matters, bankruptcy, none of those kinds of things. I'm not asking you questions about those. The only thing I want to know, whether or not you have been involved in bringing an action for a personal injury or wrongful death. I don't care if it is a car accident, and if it's property damage I'm not asking about that.

Has anyone on the panel or any member of your immediate family brought an action *against anybody else,* for personal injury or wrongful death?

(emphasis added).

Defendants argue that counsel's question did not "unequivocally" trigger Juror "R's" duty to disclose the products liability action against the manufacturer of the product that injured her husband. *Cf. Keltner,* 42 S.W.3d at 722–23, 726 (court announced that the standard it applied was "whether a lay person would reasonably conclude that the undisclosed information was solicited by the question" but court also couched analysis in terms of whether the question "unequivocally triggered" juror's duty to respond). He argues that the phrase "against anybody else" implies that the question includes actions against individuals but excludes actions against corporations and the like.

It is true that the word "anybody" means "a person out of an indefinite number" or "any person" or "anyone." *Webster's Third New International Dictionary* 97 (1993). But defendants' argument ignores the context of the inquiry. *See Bell,* 90 S.W.3d at 120. As set forth above, plaintiffs' counsel prefaced his question by declaring generally that he wanted to know about "any cases" that any of the panelists or their immediate family members had brought as plaintiffs for personal

injury or wrongful death and listing the categories of cases that did not warrant a response. This context demonstrates that the inquiry was not restricted to actions against individuals.

Furthermore, other lay people on the jury did not interpret the question so narrowly as Juror "R" did. Yet Juror "R" remained silent in the face of such responses and did not seek to determine whether her case might require a response as well. Out of the eleven jurors who responded to the question, at least three disclosed actions brought against parties other than individuals: one against a restaurant, one against an insurance company, and one against a car dealership.[2] Indeed, when counsel for Dr. Nadolski asked the venire member whose father had sued a restaurant whether that venire member believed that "somebody" in that case had done something wrong, the venire member responded "Yes." This exchange further suggests that reasonable lay people on the jury understood the words "anybody" and "somebody"—in context—to refer to actions against companies as well as individuals.

*Compare Id.* at 119–22 (where trial counsel asked prospective jurors "[H]ow many of you or members of your immediate family or close friends have had a claim brought against you?" an ordinary lay person reasonably would have concluded that the question called for disclosure of suit for personal injuries because, among other things, the responses of the venire panel demonstrated that there was a common understanding among the members that the discussion went to claims and lawsuits) with *Keltner,* 42 S.W.3d at 719, 724 (where trial counsel asked prospective

juror "Has anyone claimed you did something wrong that you are responsible for, an injury or something else, and filed a claim or suit against you?" question was not sufficiently clear to require disclosure of past collection suits because context suggested that counsel was focusing on personal injuries and none of the panel members responded with information about collection suits). The standard for evaluating the clarity of the question is not how Juror "R" interpreted the question; it is how a "reasonable lay person" would interpret the question. At least three other lay people interpreted the question to include actions against companies. *But see Stallings v. Washington Univ.,* 794 S.W.2d 264, 267 (Mo.App. E.D.1990) ("The fact that two venirepersons answered a question that was not asked cannot mean the question was asked, either expressly or implicitly. To the contrary, logic dictates these venirepersons misunderstood the question, and [the juror who remained silent] did not.").

Given the context of the question and the common understanding of the question among the venire panel members, we conclude that the inquiry was sufficiently clear to require a response from Juror "R."

**2. The Trial Court Did Not Abuse its Discretion in Concluding that Juror "R's" Non–Disclosure was Intentional**

 Because we conclude that Juror "R" failed to disclose requested information, the next question is whether her non-disclosure was intentional or unintentional. Intentional non-disclosure occurs "1) where there exists no reasonable inability to comprehend the information solic-

---

**2.** Dr. Nadolski counts twelve panelists who responded to the question and argues that nine of them disclosed actions against parties other than individuals. Beyond the three al-

ready identified, however, the remaining responses are too indefinite to conclude who the defendants were in those cases.

ited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable." *Williams,* 736 S.W.2d at 36. Unintentional non-disclosure occurs "where, for example, the experience forgotten was insignificant or remote in time ... or where the [prospective juror] reasonably misunderstands the question posed." *Id.*

Whether non-disclosure is intentional or unintentional is a determination left to the sound discretion of the trial court. *Id.* This court will not disturb that determination absent a showing that the trial court abused its discretion. *Id.*

At the post-trial evidentiary hearing on Dr. Nadolski's motion for new trial, Juror "R" acknowledged that she had heard trial counsel's question. She further acknowledged that other venire members had mentioned actions against companies as well as individuals. And she acknowledged that at the time of *voir dire* she had not forgotten about the action against the manufacturer of the product that injured her husband.

Instead, she claimed that she did not disclose that action because she "stopped" when she heard the word "anybody" and did not think that the question applied to an action against an "entity." She figured that other jurors who disclosed such actions just didn't listen well to the question. As she explained to trial counsel at the post-trial evidentiary hearing, "I listened to you ask the question and made up my mind then, and I didn't care what these people said. I was listening to you and I thought you said person or anybody or somebody."

Juror "R's" explanation was not implausible. *Cf. Stallings,* 794 S.W.2d at 267

(putting no stock in argument that juror should have responded because two other jurors responded; that other jurors responded showed only that they misunderstood the question asked by counsel). Because the trial court alone determines the credibility of the witnesses, however, we cannot say that the trial court abused its discretion in finding that Juror "R's" non-disclosure was intentional. *See Bell,* 90 S.W.3d at 123; *Hoff v. Posten,* 963 S.W.2d 13, 14–15 (Mo.App. W.D.1998) ("Deferring to the circuit court's credibility determination in this case, we discern no basis for ruling that the circuit court abused its discretion in finding Greenway's explanations lacking in credibility and reasonableness"). The trial court could have concluded that Juror "R" had no reasonable inability to comprehend the question. Juror "R" admitted that she heard counsel's question and that she heard the responses of her fellow jurors to that question. Under the circumstances, the trial court could have disbelieved any assertion that she did not understand the question to apply to actions against parties other than individuals. Juror "R" may have decided in her own mind that the question did not apply to her situation, but a juror is not the judge of her own qualifications. *See Rife v. State Farm Mut. Auto. Ins. Co.,* 833 S.W.2d 42, 43 (Mo.App. W.D.1992). Furthermore, Juror "R" admitted that at the time of *voir dire* she actually remembered the undisclosed prior litigation.

Questions and answers related to a prospective juror's prior litigation experience are always material. *Bell,* 90 S.W.3d at 123. Because the trial court was within its discretion in ruling that juror "R" intentionally failed to disclose the prior lawsuit, this court need not inquire into prejudice. *See Brines ex rel. Harlan v. Cibis,* 882 S.W.2d 138, 140 (Mo. banc 1994) ("Only where a juror's inten-

tional nondisclosure does not involve a material issue, or where the nondisclosure is unintentional, should the trial court inquire into prejudice."). The Nadolskis are entitled to a new trial. *See Bell*, 90 S.W.3d at 123–24.

### III. Conclusion

We conclude that plaintiffs made a submissible case on the question of causation. We further conclude that the trial court did not err in granting plaintiffs' motion for a new trial on the ground that one of the jurors intentionally failed to disclose information requested in response to a clear question. Because the trial court appropriately granted a new trial on that ground, we need not consider whether the trial court appropriately granted a new trial on the ground that defendants improperly injected collateral source evidence into the case. The trial court's judgment ordering a new trial is affirmed and the case is remanded for a new trial.

JOSEPH M. ELLIS, C.J. and LISA WHITE HARDWICK, J., concur.