Ryan A. FIELDER, Respondent,

v.

Robert E. GITTINGS, Appellant.

No. WD 70212.

Missouri Court of Appeals,
Western District.

Feb. 23, 2010.

Application for Transfer to Supreme Court
Denied March 30, 2010.

Application for Transfer Denied
June 29, 2010.

William A. Mallory, Overland Park, KS, for appellant.

Douglas F. Noland, Liberty, MO, for respondent.

Before LISA WHITE HARDWICK, P.J., JAMES M. SMART, JR., and ALOK AHUJA, JJ.

JAMES M. SMART, JR., Judge.

Robert Gittings appeals the judgment of the Clay County Circuit Court granting a new trial on Ryan Fielder's petition claiming automobile negligence. He claims the trial court erred in granting a new trial on the basis of juror non-disclosure. The judgment is affirmed.

### Facts

Ryan Fielder filed a petition in February 2007 alleging that he was injured by Robert Gittings' negligent operation of a vehicle. After a trial, the jury returned a verdict in favor of Fielder and against Gittings. The jury awarded Fielder damages in the amount of $40,000. Fielder filed a motion for a new trial premised on intentional juror non-disclosure during

*voir dire.* The trial court granted Fielder's motion for a new trial.

Gittings appeals.

## Analysis

The parties have a right to a fair and impartial jury composed of twelve qualified jurors. *Nadolski v. Ahmed,* 142 S.W.3d 755, 764 (Mo.App.2004). "Among other things, this means that the jurors who hear the case should be unbiased individuals whose experiences, even innocently and reasonably undisclosed, will not prejudice the case." *Id.* "During *voir dire* examination, each prospective juror therefore has a duty to fully, fairly and truthfully answer each question asked so that determinations may be made about each juror's qualifications and counsel may make informed challenges." *Id.* "When a juror fails to heed her duty by withholding material information and that failure results in bias and prejudice to the moving party, a new trial is warranted." *Id.*

### *Clear Question*

In determining whether to grant a new trial for juror nondisclosure, the court first must determine whether a nondisclosure occurred at all. *State v. Mayes,* 63 S.W.3d 615, 625 (Mo. banc 2001). Nondisclosure can occur only after a clear question is asked during *voir dire. Brines By Harlan v. Cibis,* 882 S.W.2d 138, 139 (Mo. banc 1994). An unequivocal question triggers a venireperson's duty to disclose. *Id.* Silence to an unequivocal question establishes juror nondisclosure if the information is known to the juror. *Id.; Heinen v. Healthline Mgmt., Inc.,* 982 S.W.2d 244, 248 (Mo. banc 1998). "This is an objective inquiry that looks to whether the appellant can show that there exists no reasonable inability to comprehend the information solicited by the question." *McBurney v. Cameron,* 248 S.W.3d 36, 42 (Mo.App.

2008). In other words, if a person could reasonably be confused, the question is not sufficiently clear to warrant further inquiry into the alleged nondisclosure. *See id.* The threshold determination of the clarity of a question is reviewed *de novo. Id.* The reasonable interpretation of the question depends on the context of the question as well as the wording of the question. *Id.* at 44.

Fielder's motion for a new trial was predicated on the failure of jurors Sherman, Wilson, and Rude to disclose their involvement in collection and landlord/tenant actions. With respect to juror Sherman, Fielder cited two suits in which juror Sherman was involved: (1) a breach of contract claim brought by a credit card company and (2) a suit on account brought by a real estate lending company. Both suits resulted in default judgments against juror Sherman. With respect to juror Rude, Fielder cited three suits in which juror Rude was involved: (1) a petition on account; (2) a breach of contract claim brought by a credit card company; and (3) a petition for delinquent Missouri individual income tax. All three suits were brought in Associate Circuit Court and resulted in default judgments against juror Rude. With respect to juror Wilson, Fielder cited four suits in which juror Wilson was involved: (1) a petition on account brought by a credit card company; (2) a rent and possession action filed against juror Wilson that was dismissed once but later re-filed; and (3) an unlawful detainer action filed against juror Wilson. All claims resulted in default judgments.

In his first point, Gittings claims that any alleged non-disclosure by the three jurors of collection and landlord/tenant actions was the direct and sole result of Fielder's failure to ask a clear and concise *voir dire* question about prior litigation experience. He states that the con-

text of Fielder's questions focused solely on personal injury litigation experience.

The following relevant questioning occurred during *voir dire:*

[**Fielder's counsel**]: As the Judge has indicated to you, this is a civil case. It's not a criminal case. It's a civil case. We're going to be here to ask for money to make up for the harm that Ryan has suffered as a result of what we believe the evidence will be what the defendant has done here. I've got kind of a number of questions I want to ask you. *To start off, is there anybody here, either themselves or their family members, who has ever filed a lawsuit much the same as Ryan has in this case here? Either you or a family member ever filed a lawsuit?*

**VENIREMAN THERLING:** Yes.

[**Fielder's counsel**]: Tell me about that, sir.

**VENIREMAN THERLING:** My aunt three or four years ago got hit in a parking lot and filed a lawsuit on it and settled it.

[**Fielder's counsel**]: That was your aunt, is that correct?

**VENIREMAN THERLING:** Yes.

[**Fielder's counsel**]: She was injured?

**VENIREMAN THERLING:** Yes.

[**Fielder's counsel**]: Anything about that, one way or another, that causes you to lean one way or another on this case here?

**VENIREMAN THERLING:** Other than her being my aunt, no.

[**Fielder's counsel**]: Thank you very much, Mr. Therling. Anyone else in the jury box here? Mrs. Carnes.

**VENIREMAN CARNES:** Thirteen years ago, we lost a baby through a procedure being done so we took the doctor to court and we got it settled.

[**Fielder's counsel**]: I'm very sorry to hear that. Anyone else? Yes, sir, Mr. Vanderford.

**VENIREMAN VANDERFORD:** It's been about 20 years ago. Somebody keyed my wife's car at the bank where she worked and there was a class action. The employees went together and pressed charges.

[**Fielder's counsel**]: So that involved like a credit card or a bank card?

**VENIREMAN VANDERFORD:** No, they had a key and keyed the cars at the bank.

[**Fielder's counsel**]: Okay.

**VENIREMAN VANDERFORD:** Seven or eight cars were involved.

[**Fielder's counsel**]: So that was just damage to the cars?

**VENIREMAN VANDERFORD:** Yes.

[**Fielder's counsel**]: Anyone else in this area?

[There is no response from the jury panel.]

[**Fielder's counsel**]: How about back in the first row here? Mr. Stubbs?

**VENIREMAN STUBBS:** Correct. I guess it was about 7 years ago. My wife and daughter were involved in an accident where a drunk driver crossed the road and hit their vehicle. We had to file suit against them.

[**Fielder's counsel**]: Was that case—I'm sorry to hear that as well. Were they hurt bad in the case?

**VENIREMAN STUBBS:** Yeah, broken ribs and ankle and things like that that took quite a while to heal.

[**Fielder's counsel**]: Was the case settled?

**VENIREMAN STUBBS:** Yeah, it settled without trial.

[**Fielder's counsel**]: How do you kind of feel about all that now after the case is

over with in terms of the legal system and what you had to go through?

**VENIREMAN STUBBS:** I guess it worked the way it was supposed to. We settled with the insurance company for the other party. I'm not sure whether the amount was fair or not, but that's what we settled on.

**[Fielder's counsel]:** And how long ago was that, Mr. Stubbs?

**VENIREMAN STUBBS:** I think that was seven years ago.

**[Fielder's counsel]:** And that was your wife and daughter?

**VENIREMAN STUBBS:** Correct.

**[Fielder's counsel]:** Thank you very much, sir. We've got a few more hands here. Mr. Hughes?

**VENIREMAN HUGHES:** Hughes, yes. I personally have not filed a suit, but my insurance company did on my behalf basically to recoup their costs on an accident that was someone else's fault, but I didn't benefit from that.

**[Fielder's counsel]:** It probably involved property damage?

**VENIREMAN HUGHES:** Yes.

**[Fielder's counsel]:** Anybody injured in that?

**VENIREMAN HUGHES:** No.

**[Fielder's counsel]:** Thank you very much. Did you have to go to court on that, Mr. Hughes?

**VENIREMAN HUGHES:** Yes, it did go to trial.

**[Fielder's counsel]:** Thank you very much.

**VENIREMAN BUCK:** Hi, my name is Debbie Buck. I was hit from behind 8 years ago. It shattered my left hand and cracked my right knee drum. We went to court. It was not a good experience.

**[Fielder's counsel]:** Did you have a trial?

**VENIREMAN BUCK:** Uh-huh.

**[Fielder's counsel]:** Was it up here in Clay County?

**VENIREMAN BUCK:** Yeah, it was right here in this room actually.

**[Fielder's counsel]:** And how long ago was that, ma'am?

**VENIREMAN BUCK:** Five years ago.

**[Fielder's counsel]:** Were you the driver of the other car or were you a passenger?

**VENIREMAN BUCK:** I was driving, and I was hit from behind.

**[Fielder's counsel]:** You were hit from behind?

**VENIREMAN BUCK:** Uh-huh.

**[Fielder's counsel]:** Thank you, ma'am. You said that it wasn't a pleasant experience. Anything more that you'd care to tell us about that process that you kind of feel one way or another—this is a new case with new facts.

**VENIREMAN BUCK:** I have to tell the truth so I'll tell the truth. I was not pleased with how it turned out. It took almost two years to rebuild my hand. By the time the insurance company got their share and the lawyers got their share, I had $1,200, and I still can't make a fist and my knee still goes out sometimes. It was a real bad experience.

**[Fielder's counsel]:** I'm sorry about your injury.

**VENIREMAN BUCK:** Thanks.

**[Fielder's counsel]:** Anyone else? Mr. McMullin.

**VENIREMAN McMULLIN:** Twenty years ago, a one-car injury accident involving my wife, her sister and her brother, a rollover on I–70. She was critically injured and still suffers. Broken neck, spleen, those types of injuries.

There was litigation during that. It was a construction company.

[**Fielder's counsel**]: Anything about that process that you have some feelings one way or another that could have some bearing on how you look at things in this case?

**VENIREMAN McMULLIN:** I'll just look at the data that's provided.

[**Fielder's counsel**]: Thank you, Mr. McMullin.

**VENIREMAN BARTKOSKI:** My name is Joe Bartkoski. About four years ago, my wife was hit by a driver coming off the Broadway Extension. It was right after the birth of my little daughter which she was—it was settled out of court, but she to this day still has some problems where she has to go to a chiropractor. For about two to three months after the wreck, she was not allowed to lift our little baby girl at that time. It caused a lot of trouble at that point. Not having a mother be able to lift her own baby is not a good thing after an accident. That was about four to four and a half years ago.

[**Fielder's counsel**]: Thank you very much, sir. I think there was one more hand back there.

**VENIREMAN BYRAM:** My name is Bill Byram. Approximately three to four years ago, a semi backed into my wife. For whatever reason, they claimed their fault and paid for the car, but said they were not responsible for the people in the car, however they figured that. We had to sue them for her accident. It was neck injury that involved surgery to her neck. She has steel plates in the vertebrae still in her neck. She still suffers from headache and arm numbness. We did eventually settle out of court. Due to the fact that she still has the problems with it, I don't feel it was a proper amount.

[**Fielder's counsel**]: Thank you very much, Mr. Byram. Mr. Randolph.

**VENIREMAN RANDOLPH:** Jeff Randolph. I had an accident when I was 16 where we had to file a lawsuit to get all the doctors' bills and attorney fee bills taken care of. It settled out just fine, but we did have to file a lawsuit against that.

[**Fielder's counsel**]: Thank you, Mr. Randolph. Anyone else? Mrs. Nolan.

**VENIREMAN NOLAN:** Yes, my name is Sidonia Nolan. My mother was an employee at Price Chopper. They had a broken ice machine, and she had fell in a puddle of water and separated her rotator cuff and had to have surgery and a permanent pin put in.

[**Fielder's counsel**]: Was there some type of worker's comp case?

**VENIREMAN NOLAN:** Yeah, right. That was about 12 years ago.

[**Fielder's counsel**]: And she had surgery on her—

**VENIREMAN NOLAN:** Her shoulder had a permanent pin put in, and she has certain restrictions now with her shoulder.

[**Fielder's counsel**]: Thank you very much, Mrs. Nolan.

**VENIREMAN KOCH:** I'm Jeanette Koch. I believe it was last September. My son was involved in an accident. A young girl went across the road in front of him. He could not avoid her and hit the rear end of her car. The insurance company settled it probably three months later, but they did say my son was partially to blame because he should have gotten stopped. But there was really no way. We don't feel like there was any way he could have stopped without hitting her. But it was settled out of court. I don't—as far as whether it was fair, we can't really tell.

[Fielder's counsel]: Was there an actual lawsuit filed in that, Mrs. Koch?

VENIREMAN KOCH: There was not a lawsuit filed. The young girl that was hit, her father was a police officer in Clay County, and he came after the accident. Looking at the police reports, the badge numbers did not match from what the officer, the attending officer, gave my son and then the officer's number that was on the police report.

[Fielder's counsel]: Okay. Anyone else? [There is no response from the jury panel.]

[Fielder's counsel]: A number of you responded to that. *I'd kind of like to just ask the reverse of that question if I could. Is there anybody here, either themselves or their family members, that have had a lawsuit filed against them for some reason or another, that somebody has made a claim or a lawsuit against them seeking some type of recovery.*

THE COURT: You're not counting divorces, are you, [Fielder's counsel]?

[Fielder's counsel]: No.

VENIREMAN EDWARDS: I'm Barbara Edwards. My mother had—her father died. My grandfather died in an accident, and the other person involved ended up suing my mom and her sister for claims, but it was not in this state.

[Fielder's counsel]: So it was kind of an estate, probate litigation?

VENIREMAN EDWARDS: It was.

[Fielder's counsel]: But it involved—I have a hard time. I think it's my age. I have a hard time hearing up here. Did this involve your father?

VENIREMAN EDWARDS: My grandfather.

[Fielder's counsel]: Thank you, Mrs. Edwards. Anyone else? We've got Mrs. Kilgore.

VENIREMAN KILGORE: When I was a real estate agent several years ago, I sold a house that had a new roof put on it. The buyers sued the real estate company and the roofer because they said the roof wasn't up to code.

[Fielder's counsel]: Okay.

VENIREMAN KILGORE: And my little brother was involved in a car accident several years ago. He was charged with injuring the other party.

[Fielder's counsel]: That's kind of a different issue. You mean charged like a criminal charge or a traffic ticket or something like that?

VENIREMAN KILGORE: I think both. I'm not real sure. He went to court for it. I don't really know what all happened.

[Fielder's counsel]: Was there somebody else here?

VENIREMAN RIGA: Riga.

[Fielder's counsel]: Riga.

VENIREMAN RIGA: My husband is in real estate. It was a real estate transaction that went wrong. He ended up in court and we lost.

[Fielder's counsel]: Anyone else in this area here? How about back here? Mr. McDaniel.

VENIREMAN McDANIEL: Joe McDaniel. I had a mechanic's lien placed against a builder of a home that I purchased and ultimately myself for payment that he didn't provide.

[Fielder's counsel]: Anybody else? Thank you, sir. Mr. Hughes.

VENIREMAN HUGHES: Yes. I had a suit filed against my business. I'm in the roller skating business and had a customer file a suit but it never made it to court. In fact, it barely—it went through my portion of the interrogatories, but the plaintiff didn't respond to

my attorney's request for information so the suit was eventually dropped.

[**Fielder's counsel**]: Okay. Thank you, Mr. Hughes. Mr. McMullin, did you raise your hand?

**VENIREMAN McMULLIN**: Charles McMullin. My father was taken to court over a mulberry bush. It turned out that mulberry bushes are $1,000 if you'd like to get rid of one. That was their settlement.

[**Fielder's counsel**]: Thank you, sir. Anyone else?

[There is no response from the jury panel.]

[**Fielder's counsel**]: I think we've covered that, and a lot of you responded. I asked about lawsuits, and a number of you responded that you had lawsuits. I know some of you were talking about claims, too. I just want to be sure. Is there anybody else here that maybe has had a claim, either themselves or a family member had a claim where they sought damages, sought some type of compensation to make up for the loss from another person that didn't go to a lawsuit stage? It just went to a claim stage. Looks like we've got a few people here. Mrs. Wilt.

Fielder's counsel first asked the venirepersons if they had ever filed a lawsuit "much the same" as Fielder did. This could have referred to any type of lawsuit or to specifically personal injury lawsuits. Then, Fielder's counsel asked "the reverse" of that question. Fielder argues that the second question encompassed *all* litigation, thus triggering jurors Sherman, Rude, and Wilson's duty to disclose the later-discovered suits. Gittings argues that the second question was restricted to personal injury litigation because Fielder's lawsuit was one for personal injury and much of the *voir dire* questions pertained to issues specific to personal injury litiga-tion. Gittings cites several cases where the context in which the question at issue arose focused heavily on personal injury litigation, thus making a question about all litigation unclear. *See, e.g., McBurney*, 248 S.W.3d 36; *Payne v. Cornhusker Motor Lines, Inc.*, 177 S.W.3d 820 (Mo.App. 2005); *Keltner v. K–Mart Corp.*, 42 S.W.3d 716 (Mo.App.2001).

The second question asked if the venirepersons had ever been a defendant in a lawsuit "for some reason or another" or if a suit or claim had sought "some type of recovery" from them. The trial judge interpreted this question as being broad and attempted to narrow it down by asking if counsel was excluding divorce cases. Six venirepersons responded to the second question and revealed prior lawsuits in which they or their family members had been sued in the past. These cases involved probate litigation, a faulty roof, criminal charges, a mechanic's lien, a real estate transaction, a roller skating business, and a mulberry bush. No venireperson responded to the question with an incident of personal injury litigation. Fielder's counsel's responses to the answers given does not narrow or focus in on any particular type of lawsuit.

Further, this is not a case where the context in which the second question was asked was unclear because the context focused on personal injury litigation. Prior to asking the first and second question at issue, Fielder's counsel made the following inquiries:

Has anyone been through the jury selection process before?

Does anyone know Fielder or Fielder's mother?

Does anyone know the driver of the car in which Fielder was a passenger?

Does anyone know about the accident that is the subject of the suit?

Does anyone know Gittings or Gittings' wife?

Does anyone know a witness to the accident?

Does anyone know the law enforcement officers who responded to the accident?

Does anyone know the medical personnel who treated the accident victims?

Does anyone work as a safety officer of look at safety procedures as part of their job?

Has anyone ever worked for an adjusting company that adjusts claims?

Gittings argues that the following constitutes context rendering the second question unclear:

While stating his general perception of the case, Fielder's counsel stated that the jurors would have to decide who is at fault in this case and what amount of harm that Fielder has suffered.

Prior to asking if anyone is "familiar with this *collision,*" Fielder's counsel stated that the case involves a *"car accident, a car wreck"* that occurred on July 1, 2006, and that the *"car accident"* involved Fielder, who was a passenger.

Prior to asking if anyone knew the medical personnel who treated the accident victims, Fielder's counsel stated that Fielder was taken by MAST Ambulance to Liberty Hospital "following this *collision.*"

Gittings argues that these references to the facts leading to the initiation of the lawsuit set all subsequent questions in a context of referring only to personal injury litigation. We disagree. A car accident occurred. The jury would be asked to determine who was at fault. In ascertaining if any of the venirepersons knew the parties or potential witnesses at trial, Fielder's counsel referred to the factual basis: a car accident. Gittings also cites the following:

When two venirepersons disclosed that they worked in the safety field, Fielder's counsel asked them if they investigated accidents.

Gittings says Fielder's counsel focused, on this one question, on venirepersons with experience investigating accidents. None of this creates a context wherein Fielder's second question could · be understood as referring only to personal injury litigation.

Fielder's counsel's second question, asking if any venireperson had been a defendant in any type of litigation with the exception of divorce cases, was sufficiently clear to trigger a duty to disclose on the part of jurors Sherman, Rude, and Wilson. The first point is denied.

### Intentional or Unintentional

 Once nondisclosure is established, it must be determined whether the nondisclosure was intentional or unintentional. *Mayes,* 63 S.W.3d at 625. This determination is left to the sound discretion of the trial court. *Williams By Wilford v. Barnes Hosp.,* 736 S.W.2d 33, 36 (Mo. banc 1987). "Intentional nondisclosure occurs: 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable." *Id.* "Unintentional nondisclosure exists where, for example, the experience forgotten was insignificant or remote in time, or where the [venireperson] reasonably misunderstands the question posed." *Id.*

In his second point, Gittings claims that any alleged non-disclosure by the three jurors of collection and landlord/tenant actions was unintentional and reasonable. He states that Fielder's question addressing prior litigation experience could rea-

sonably be interpreted as seeking only prior personal injury litigation experience. Because we have already determined that the question was clear enough to trigger the duty to respond, and because Gittings' argument here is essentially a reargument of Point I using different terminology, we cannot do other than reject this argument.

Trial was held in June 2008. While he was sitting on the jury, juror Sherman had two lawsuits pending against him in the Associate Circuit Court of Clay County. The three cases involving juror Rude as a defendant occurred after April 2000. The four cases involving juror Wilson as a defendant occurred after September 2001. Judgments were entered against her in November 2001, March 2006, and December 2007. A dismissal was entered in June 2007.

Prior to the hearing on the motion for new trial, Gittings obtained affidavits from all three jurors. The affidavits were prepared by Gittings' counsel. All three were identical, except for the last sentence of juror Wilson's affidavit. They were all notarized by the same notary on the same date. All three contained the following "I understood the question of Mr. Fielder's attorney . . . regarding involvement in litigation to refer to personal injury lawsuits."

All three jurors testified at the hearing on the motion for a new trial. Juror Sherman stated several times that he answered truthfully during *voir dire* and that he understood Fielder's counsel's question as referring only to personal injury lawsuits. Juror Sherman said he was embarrassed about the suits but that he would not have lied about it. In the suit on account, the default judgment was granted by the Honorable Anthony Rex Gabbert, the presiding judge at trial. Judge Gabbert stated that he has personally known juror Sherman for a number of years and that juror Sherman had assisted in Judge Gabbert's mother's funeral. Juror Sherman testified that one of his collection matters was actually pending before Judge Gabbert during the time which juror Sherman was serving on the jury and that Judge Gabbert was aware of the case. Juror Sherman also testified that he felt that the motion for new trial implied that he intentionally lied under oath and concealed the lawsuits.

Juror Wilson stated several times that she understood the *voir dire* question at issue as seeking information only with regard to litigation involving personal injury. She said she did not intentionally conceal any information during *voir dire*. Juror Wilson testified that at the time the unlawful detainer action was filed, her husband had been handling the household finances and that he had since passed away. All the suits resulted in default judgments against juror Wilson.

■■■■■■ "A trial court's findings concerning whether a juror has failed to disclose relevant information, and concerning whether a juror's explanation for any nondisclosure is reasonable, are accorded great weight, and will not be disturbed on appeal unless the trial court abused its discretion." *Banks v. Village Enterprises, Inc.*, 32 S.W.3d 780, 787 (Mo.App.2000). Where the trial court rules on a party's motion for new trial without making specific findings, reviewing authority considers all findings necessary to the result to be implicit in the trial court's decision. *Id.* "Intentional nondisclosure occurs if the juror is reasonably able to comprehend the information solicited by the question asked by counsel, and where the potential juror actually remembers the experience or it is unreasonable for the potential juror to have forgotten it." *Bradford v. BJC Corp. Health Serv.*, 200 S.W.3d 173, 182 (Mo. App.2006). If a court finds intentional nondisclosure, it effectively *per se* requires a new trial. *Id.*

■■■■ Jurors Sherman and Wilson claimed that they did not reveal the non-

disclosed litigation because they believed Fielder's counsel's question sought only instances of personal injury litigation. As discussed in the first point, Fielder's counsel's question, from an objective standpoint, was sufficiently clear. Both jurors signed identical affidavits, prepared by Gittings' counsel, stating that they understood the question to pertain only to personal injury litigation. This could have influenced their testimony at trial. Juror Sherman also believed his nondisclosure was being characterized as an intentional lie. The trial court could reasonably have believed that the prior execution of the affidavits would tend to make a person reluctant to admit that he or she should have disclosed the other litigation. Both jurors were reasonably able to comprehend the information sought, and remembered or should have remembered the other litigation. A finding that their nondisclosure was intentional cannot be considered an abuse of discretion.

Juror Rude stated several times that at the time the questions were asked during *voir dire*, he did not have any recollection of any litigation in which he was involved. Juror Rude's affidavit, in contrast, stated that he understood the question at issue to refer to personal injury litigation. The trial court could have found not credible (or not reasonable) his testimony that he did not remember the prior litigation given his contradictory affidavit. Nondisclosure is unintentional only if the forgetfulness was reasonable. *Massey v. Carter*, 238 S.W.3d 198, 202 (Mo. App.2007). Juror Rude claimed to have forgotten three separate lawsuits in which he was named a defendant. The suits were filed in 2000 and 2002, six and eight years before Fielder's trial. The trial court could have found that Fielder's lack of memory was not reasonable. *See Bradford*, 200 S.W.3d at 182 (stating that "it may seem incredible that a person would not remember being sued nearly five years

earlier"). The trial court could have found that juror Rude's forgetfulness was unreasonable. Such a finding was not an abuse of discretion.

"[B]ias and prejudice will normally be presumed if a juror intentionally withholds material information." *Mayes*, 63 S.W.3d at 625. A prospective juror's litigation history is deemed material. *Brines*, 882 S.W.2d at 140. Accordingly, a finding of intentional nondisclosure of a material issue is tantamount to a *per se* rule mandating a new trial. *Heinen*, 982 S.W.2d at 248. The second point is denied.

### Timeliness

In his third point, Gittings claims that Fielder waived his right to seek a new trial predicated on juror non-disclosure of prior litigation experience. Gittings points out that Fielder failed to raise the issue of juror non-disclosure prior to jury deliberations. He states that had Fielder raised the issue prior to deliberations, the matter could have been remedied without need of the time and expense of a new trial by utilizing an alternate juror. Gittings asks this court to "consider adopting a due diligence/timeliness requirement by which a party seeking a new trial predicated on juror non-disclosure of prior litigation history be required to, at the very minimum, conduct a search of the jurors in question via CaseNet prior to submission of the case to the jury." Even if this court thought there could be value in such a bright-line waiver rule, this court has no authority for such.

The lack of a bright-line waiver rule, either of total waiver or of simply a waiver of the conclusive presumption of prejudice, however, does not mean that court and counsel are entirely powerless to deal with the fact that venirepersons face a strong temptation to avoid disclosure of any embarrassing personal litigation history. Re-

gardless of whether there is any change in the applicable law, trial judges and attorneys may consider ways to help venirepersons overcome their litigation embarrassment so as to be more responsive to the duty to make full disclosure.[1] For now, in any event, we must follow the applicable law.

### Conclusion

The judgment is affirmed.

All concur.

---

1. Beyond making sure that the litigation questions are clear, the court could also, for instance, advise the venirepersons that the duty to disclose is taken very seriously and that an intentional nondisclosure can result in the entire case being tried again. The court could mention that the public records will likely be examined after the verdict and it will be ascertained whether the questions about litigation history were properly and fully answered. Such examination will ordinarily result in any juror suspected of nondisclosure being summoned back into the courtroom to publicly give an account and explanation of the reason for the nondisclosure.

Unless contrary to local rules, judges can allow the attorneys access to the jurors' personal information for a specified period of time after jury selection for the limited purpose of a search. Also, an enterprising party can "go the extra mile" to protect a potential verdict by conducting a timely search of the records, then providing a copy of the search results to the opposing party, so that any concerns as to nondisclosure can be handled before submission.