**Bobby J. MAYES, Appellant,**

v.

**STATE of Missouri, Respondent.**

No. SD 29730.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 1, 2011.

Motion for Rehearing or Transfer to
Supreme Court Denied Aug. 23, 2011.

Application for Transfer Denied
Oct. 25, 2011.

Laura G. Martin, Kansas City, for Appellant.

Chris Koster, Atty. Gen., Jamie Pamela Rasmussen, Asst. Atty. Gen., Jefferson City, for Respondent.

DANIEL E. SCOTT, Chief Judge.

Convicted of brutally murdering his wife and stepdaughter, Appellant (Movant) sought Rule 29.15 post-conviction relief based on alleged incompetency of his lawyers. These claims were rejected by the motion court and, for reasons stated herein, fare no better on appeal. We affirm the judgment denying any and all relief.

### Background

The underlying crimes and criminal proceedings were described at length in *State v. Mayes*, 63 S.W.3d 615 (Mo. banc 2001) and *State ex rel. Mayes v. Wiggins*, 150 S.W.3d 290 (Mo. banc 2004), from which we borrow without further attribution. Additional information is provided in our analysis of Movant's various points on appeal.

#### *The Crimes*

Movant lived with his wife, Sondra, and his 14–year–old stepdaughter, Amanda, at the time of the murders. He was scheduled to be tried the next day for statutorily sodomizing his two minor daughters from a prior relationship. He wanted Sondra and Amanda to testify for him, and they had been endorsed as defense witnesses.

Movant and Sondra were having financial and marital difficulties. Shortly before the murders, Movant talked briefly with an acquaintance, Michael James, about his financial difficulties and indicated that he did not want to return home when his wife was there because they might get into a conflict. Movant also unsuccessfully

sought Mr. James' help to buy a gun, allegedly to rob another man.

On the last morning of her life, Sondra went to work and told a friend that "she had not been able to work up the courage" to tell Movant that she would not testify for him. Sondra went home for lunch and never returned. A neighbor saw both of the couple's cars in their driveway during the noon hour. Movant drove away shortly after 1 p.m.

No one answered when a co-worker called Sondra's house at 1:15 p.m. Sondra's father arrived 45 minutes later, knocked at the door, and called through the window. There was no response.

The neighbor saw Movant return several hours later. Shortly thereafter Movant called 911. When asked what was wrong, Movant said, "I don't know. I just come home and, I don't know. You just need to send somebody over here." Movant reported that someone was hurt and not breathing, but he refused to check for a pulse, replying that "I'm not going in there." He agreed not to touch anything and to flag down the ambulance.

A police officer arrived to find Movant pacing back and forth in the driveway and rubbing his hands with a blue shop cloth. When asked what was wrong, Movant said he did not know. The officer looked around the house and discovered Sondra's body in the master bedroom. Another officer arrived and asked Movant what was going on. Movant threw up his arms and shouted, "I have an alibi, I have an alibi. I've been fishing for the last three and a half hours." Movant was perspiring and "fidgety" and continued to wipe and scrub his hands with the blue shop cloth. When the police chief arrived, Movant said he last saw Sondra at 7 a.m.; he had been fishing at "Flat Rock" or "White Rock"; and that he briefly talked with Sondra by phone when he went home for lunch before going back to fish. The police chief noticed ligature marks on the back of Movant's hands.

After investigating Sondra's murder for some time, police learned that Amanda should have been home but had not been seen. Her partially-clothed body, with a pronounced ligature mark on her neck, was found on the floor beside her bed.

Movant was arrested, given Miranda warnings, and taken to jail where he met with his lawyer and consented to a search of his person and seizure of his clothing. Later, a doctor found a laceration on Movant's right hand and constriction injuries on the backs of both hands consistent with the ligature mark on Amanda's neck.

### The Criminal Trial and Appeal

Movant was tried on two counts each of first-degree murder and armed criminal action (ACA). The evidence indicated that Amanda was struck on the head, draped over her bed, stabbed in the back some 21 times, and strangled with a cord. Her panties were pulled down around her ankles. Sperm on the blood-stained bed sheet was consistent with Movant's DNA. The abnormal size of Amanda's rectum was consistent with sodomy or strangulation-induced spasm.

Sondra's body had defensive forearm and hand lacerations and stab wounds to her breasts. The knife also had been thrust into her back, lodged between her ribs, and pulled laterally between the bones, entering her chest cavity and puncturing her left lung and blood vessels. Blood was splattered about the room on the bed, the floor, the table, and her body.

Crime scene evidence indicated that the perpetrator cleaned up in the bathroom after the attacks. A bloody fingerprint on the bathroom sink was later matched to Movant.

One of the numerous prosecution witnesses was Movant's former cellmate, David Cook, who testified that Movant told him that he killed Sondra and Amanda, how he did so, and about the family's financial, marital, and legal problems. On cross-examination, defense counsel impeached Cook by showing that Cook's pending criminal charges were reduced after he agreed to testify against Movant.

After a trial lasting more than a week, jurors deliberated less than two hours before finding Movant guilty on all counts. He was sentenced to death for the murders and life imprisonment on the ACA convictions. The Missouri Supreme Court affirmed the convictions and life sentences, but found error in the death penalty phase, and remanded for further proceedings. Ultimately, Movant was sentenced to life without parole for each murder.

### The PCR Proceedings

Movant timely sought Rule 29.15 post-conviction relief, asserting various ineffective assistance of counsel (IAC) claims. The motion court heard evidence for seven days over an 18–month period and denied all claims via 44 pages of detailed findings of fact and conclusions of law.

### Principles of Review

Our review is limited to determining whether the motion court's findings and conclusions are clearly erroneous. Rule 29.15(k). Those findings are presumptively correct; we defer to that court's credibility decisions; and we will reverse only if our review of the whole record firmly and definitely convinces us that a mistake was made. *See O'Shea v. State*, 288 S.W.3d 805, 807 (Mo.App.2009).

### Point I—Conflict of Interest

■ Attorneys Michelle Monahan and Ruth O'Neill represented Movant at his preliminary hearing, but Monahan withdrew when Movant's case was transferred to the Central Capital Office of the Public Defender (Capital Office). Monahan subsequently represented David Cook to conclusion on charges unrelated to Movant's charges.[1] Monahan then transferred to the Capital Office prior to Movant's trial, but did not further represent Movant or Cook.

When the state endorsed Cook as a potential witness against Movant, Monahan and one of Movant's trial attorneys discussed possible conflicts due to Monahan's prior representation of Cook. The Capital Office's managing attorney saw no disqualifying conflict because Monahan was not a part of Movant's Capital Office trial team and Cook's criminal history was available to the defense from the state. Capital Office attorneys did not talk about Cook with Monahan and she did not help Movant's trial team prepare for Cook's cross-examination. Both O'Neill and Scott McBride, who were Movant's co-counsel at trial, testified at the PCR hearing that they could not recall Monahan providing any assistance in Movant's case.

■ Movant contends that Monahan, O'Neill, and McBride all operated under actual conflicts of interest. The motion court found no actual conflict of interest,

---

1. Despite Movant's characterization of the deal between Cook and prosecutors, Monahan believed the assault charge was dropped on its own merits and because Cook was headed back to prison on a probation violation. The prosecutor never said anything to Monahan connecting dismissal of the assault charge with Cook testifying against Movant. Cook may have received leniency as to other charges while he was represented by other attorneys, but the record does not show that Movant's case was a factor in Monahan's plea negotiations for Cook.

no sharing of information about one client for the benefit of another, and no defense strategy foregone out of consideration for Cook. The motion court also found that the trial evidence was so strong that Movant's conviction was "a near certainty" with or without Cook's testimony. None of these findings are clearly erroneous.

To prevail on a claim of ineffective assistance of counsel based on a conflict of interest, the movant must show that an actual conflict of interest adversely affected counsel's performance. *Price v. State*, 171 S.W.3d 154, 157 (Mo.App. E.D.2005). "In order to prove a conflict of interest, something must have been done by counsel or something must have been forgone by counsel and lost to [the movant], which was detrimental to the interests of [the movant] and advantageous to another." *Id.* (quoting *Helmig v. State*, 42 S.W.3d 658, 680 (Mo.App. E.D.2001)); *State v. Johnson*, 549 S.W.2d 348, 350 (Mo.App.St.L.Dist. 1977).

*Hickey v. State*, 328 S.W.3d 225, 228 (Mo. App.2010). The predicate for an IAC claim based on conflict of interest is proof, by evidence, that counsel actively represented conflicting interests. *Id.* A possibility of conflict is insufficient to impugn a criminal conviction. *Id.*

In *Hickey*, a public defender represented one defendant to the conclusion of his case, then represented that defendant's roommate in an unrelated case in which the first defendant was a state's witness. Our Eastern District found no actual conflict of interest because the second defendant failed to show that counsel's performance was adversely affected. *Id.* at 231.[2]

Movant asserts that Monahan either represented Movant and Cook simulta-neously or represented Movant again after defending Cook; that Monahan investigated Cook's criminal history for purposes of impeaching Cook; and that Monahan's conflict spread to O'Neill and McBride because Monahan was involved in preparing Movant's case for trial. The record, as we must view it, does not support any of these assertions. Technical conflict(s) *vel non,* Movant failed to show either an actual conflict or prejudice. If relief was not warranted in *Hickey,* there was, *a fortiori,* no clear error in denying Movant's claim of conflict. Point I fails.

### Points II, IV, and V—Cook's Testimony and Credibility

■ Movant claims trial counsel was ineffective for not moving to bar Cook's testimony (Points IV and V) or doing more to impeach Cook's credibility (Point II). The motion court did not clearly err in denying these claims.

■ The benchmark for judging any IAC claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *quoted in Deck v. State,* 68 S.W.3d 418, 425 (Mo. banc 2002). Due to a strong presumption that his lawyers provided competent assistance, Movant's heavy burden was to show that counsels' representation fell below an objective standard of reasonableness. *Deck,* 68 S.W.3d at 425.

On Movant's direct appeal, our supreme court noted that trial counsel was given "broad latitude" in cross-examining Cook about his motive to lie, impeached Cook as

---

**2.** Remand was ordered for the motion court to hear evidence on an unrelated claim of error. *Id.* at 232–33.

much as the trial court allowed, and that further cross-examination "would have added little to the substantial attacks on [Cook's] credibility already made by defense counsel." *Mayes*, 63 S.W.3d at 630. Courts rarely grant post-conviction relief after relief was denied on direct appeal. *Deck*, 68 S.W.3d at 428. This is not the case to do so.

■ Movant also complains about late disclosure of Cook's statements and alleges that the state destroyed notes taken during meetings between law enforcement and Cook. However, Movant's attorneys deposed Cook before trial and impeached him at trial about his meeting with a prosecutor and the favorable dispositions of his criminal charges. Trial counsel McBride further testified at the PCR hearing that (1) the late disclosure regarding Cook did not hamper the defense investigation; (2) he could get whatever jail records he needed and had sufficient time to "get into the situation" with Cook; and (3) a motion to exclude Cook was unnecessary and would have been denied by the trial judge.

We find no clear error regarding Points II, IV, and V. Points denied.

### Point III—Search of Car and Home

■ At 4:15 p.m. on the day of the murders, Movant called 911. He reported that someone was hurt and not breathing, and said "[y]ou just need to send somebody over here." When police arrived, Movant was in the front drive. Officers briefly spoke with Movant, then entered the home. Movant never subsequently objected to police being in or about his home. Within two hours, officers had discovered the bodies, secured the crime scene, arrested Movant, and taken him to the police station. Photos were taken but no evidence was seized before 6:10 p.m. At 8 or 9 p.m., officers searched Movant's vehicle, which was at the house. There was no search warrant for the house or vehicle searches, which yielded evidence used against Movant at trial. Movant now claims this evidence was obtained in violation of his Fourth Amendment rights and counsel was ineffective in not seeking to suppress it.

The motion court disagreed, finding that (1) Movant invited the investigation by calling 911 and never withdrew his consent, and (2) a suppression effort was inconsistent with and would have blunted the defense trial strategy, which was to emphasize Movant's cooperation with police because he had nothing to hide. The record supports both findings.

A Fourth Amendment "reasonableness" analysis starts with whether police were lawfully at the place where evidence was found. *State v. Johnston*, 957 S.W.2d 734, 742 (Mo banc.1997). When Movant called 911 and requested emergency assistance, he consented to the entry of his home which, upon discovery of a dead body, became a crime scene warranting further investigation. *Id.* The motion court cited a Texas case which made the same point:

> [W]hen a homeowner makes a 911 call and requests immediate assistance because of an emergency, he is indicating his consent to (1) the arrival and entry of the responding officers to resolve that emergency and, (2) absent any evidence of the revocation of that consent, an objectively reasonable limited investigation by the responding officers into the emergency that the homeowner reported.

*Johnson v. State*, 226 S.W.3d 439, 444 (Tex.Crim.App.2007). By making such a call, "surely the objectively reasonable homeowner envisions that the responding police will enter his home, view the scene, take pictures of that scene, and make a cursory search for relevant evidence di-

rectly relating to the homeowner's emergency call." *Id.* at 447.

At 6 p.m., with his lawyer present, Movant expressly consented to police searches of his house and vehicle and to seizure of any evidence that law enforcement "would deem necessary." Shortly after giving this consent verbally, Movant confirmed it in writing.

It is beyond cavil that valid consent searches do not offend the Fourth Amendment. Counsel will not be deemed ineffective for failing to file a meritless motion to suppress. *State v. Maddix*, 935 S.W.2d 666, 672 (Mo.App.1996). There is no suggestion in the record that Movant's trial counsel failed to investigate the law or facts relevant to the search and seizure. To the contrary, the defense closing argument reflected a strategic decision to emphasize Movant's cooperation with law enforcement and his consent to the search and seizure. IAC allegations relating to matters of trial strategy are not a basis for post-conviction relief. *Maberry v. State*, 137 S.W.3d 543, 547–48 (Mo.App.2004). We deny Point III.

### Point VI—Transcript

■ As noted previously, the evidentiary hearing spanned multiple days. Proceedings were electronically recorded and later transcribed, at which time it was discovered that some testimony by one witness had been overwritten with another recording from an unrelated matter. The parties obtained an affidavit from the witness regarding the missing testimony and submitted the affidavit to the court along with stipulations by the parties. The court received the documents, closed the record, and certified the transcript.

■ We decline to consider Movant's complaint that the motion court thus erred, and should have held a further hearing to obtain the overwritten testimo-

ny. "The post-conviction remedy is available for the defendant to attack his conviction and not to allege irregularities in the post-conviction proceeding itself." *Brock v. State*, 242 S.W.3d 430, 433 (Mo.App. 2007). Even if we could review the point, it would fail because Movant's motion counsel proposed this solution. Movant cannot claim advantage from self-invited error or challenge a procedure to which his counsel agreed. *Mayes*, 63 S.W.3d at 632, n. 6.

### Conclusion

The motion court's findings and conclusions are not clearly erroneous. Judgment affirmed. Rule 29.15(k).

BATES and FRANCIS, JJ., concur.